**Raymond Michael POTTER, Petitioner, Appellant,**

v.

**STATE of Minnesota, Respondent.**

**No. C3–86–2144.**

Court of Appeals of Minnesota.

Aug. 11, 1987.

Robert J. Milavetz, Steven E. Elias, Milavetz & Associates, P.A., Crystal, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Robert M.A. Johnson, Anoka Co. Atty., Marcy S. Crain, Asst. Co. Atty., Anoka, for respondent.

Heard, considered and decided by HUSPENI, P.J., and WOZNIAK and CRIPPEN, JJ.

## OPINION

HUSPENI, Judge.

Raymond Potter alleges on appeal that the post-conviction court erred in denying a new trial based on the victim's recantation, in denying appellant's request for an adverse psychological examination of the victim and in considering evidence that the victim's sister had also recanted her allegations of sexual abuse by appellant. We affirm.

### FACTS

Appellant was convicted of two counts of criminal sexual conduct in the first degree, Minn.Stat. § 609.342, subds. 1(a) and 1(g)(1986), and one count of criminal sexual conduct in the third degree, Minn.Stat. § 609.344, subd. 1(b)(1986), as a result of sexual abuse of his thirteen-year-old daughter T.P.[1] On April 10, 1986, appellant's seventeen-year-old daughter L.P. had contacted Anoka County authorities to report sexual abuse of T.P. and herself. T.P. reported the abuse the next day. L.P. later retracted her allegations in an in-camera pretrial proceeding. The State did not charge appellant with any criminal offense for acts involving L.P., and the State was prohibited from introducing any evidence regarding appellant's alleged sexual abuse of L.P.

At trial T.P. testified about appellant's sexual acts with her. Her testimony was corroborated by her prior consistent statements to investigator Karin Small, to a friend, Rebecca Gross, to her mother and to L.P.

After the guilty verdicts were returned, L.P. was very angry with T.P. and screamed "I'm going to kill [T.P.] when I see her." T.P. was placed in a foster home. About two weeks later she returned to the family home, and was upset that everyone in the community was talking about the trial. L.P. and her mother spoke with T.P.'s social worker about the economic impact of appellant's incarceration on the family, including the possible loss of their home.

T.P. discussed her father's sentencing, and she was advised he would probably be sent to prison. Two days later T.P. spoke to her mother and sister and recanted her trial testimony. About a week later she recanted her testimony to her social worker and to appellant's defense attorney.

Appellant filed a post-conviction relief petition requesting a new trial based on T.P.'s recanted trial testimony. At the post-conviction proceedings, T.P. testified that none of the sexual abuse incidents occurred and that she lied at trial because she wanted her parents to get divorced and force appellant to leave the home.

Dr. Gail Maudal, a clinical psychologist who had conducted a psychological examination of T.P., L.P. and their mother prior to trial, also testified. Dr. Maudal stated that T.P. testified because she wanted her father to get treatment rather than send him to jail. T.P. never expressed any hatred or vengeance toward her father. According to Dr. Maudal, T.P. did not want to feel responsible for putting her father in prison. Dr. Maudal testified that T.P. received no support from her mother or sister and that they were both aligned with appellant against T.P. Dr. Maudal testified that children frequently recant sexual abuse allegations, especially if recantation will result in family support. The post-conviction court denied appellant's motion to require an additional psychological examination of T.P.

The post-conviction court[2] heard evidence concerning L.P.'s allegations against appellant because her report and subsequent recantation were probative in determining the genuineness of T.P.'s recantation.

1. Order of this court dated May 8, 1987, directed filing of appellant's reply brief which contained numerous references to, and excerpts from, articles published in psychiatric journals. These materials were not before the trial court. The May 8 order stated that the panel which deter-mined the issues on appeal would also determine what weight to accord the disputed materials. The panel has reviewed those materials.

2. The post-conviction judge presided over the jury trial in this case.

The post-conviction court made lengthy findings of fact including the following:

The fear of their father's incarceration and their desire for his treatment has overwhelmed both [L.P.] and [T.P.]. The current testimony of both is clouded by these underlying factors and makes both of their recantations highly suspect.

\* \* \* \* \* \*

The jury had the ability, as did the trial judge, to observe [T.P.'s] demeanor, the forth-right and sincere manner in which she testified, and the spontaneous nature in which she related the details of [appellant's] activity and her reporting of same. [T.P.'s] responses during direct and cross-examination show that her testimony was not memorized. [T.P.'s] trial testimony, as well as her appearance, which both jury and trial judge had the opportunity to observe, clearly show that trial testimony to be genuine and truthful.

\* \* \* \* \* \*

Contrary to her testimony and demeanor at trial, [T.P.'s] post-conviction hearing testimony and demeanor, wherein she recanted her earlier trial testimony, had all of the appearances of being memorized. The recantation testimony was insincere and unreliable. The recantation testimony is inconsistent not only with [T.P.'s] trial testimony and the corroborating evidence, but is inconsistent with [T.P.'s] recantation to her social worker \* \* \*. [T.P.'s] explanation at the post-conviction hearing as to her reasons for testifying falsely at trial are not believable. [T.P.'s] claim that she was mad at her father is not supported by the evidence, and her claim that she falsified the sexual abuse allegations in order to separate her parents and get her father out of the home is contrary to the evidence in that [T.P.'s] report of the sexual abuse necessitated her removal from the home and placement in foster care and aligned her mother with her father against [T.P.]. [T.P.'s] recantation of her trial testimony is motivated by [her] desire to prevent the incarceration of her father and is the result of feelings of responsibility for her father's incarceration. It is not uncommon for victims in this type of case to have deep feelings of guilt and responsibility for what happened.

[T.P.] resided with her mother and sister at the time she recanted her trial testimony and her decision to recant was the product of direct and indirect pressures put upon her by her mother and sister. [T.P.'s] post-verdict, presentencing residence with her mother and sister may be characterized as an emotional "pressure cooker" for [T.P.]. [L.P.] blamed [T.P.] for the [appellant's] convictions. [T.P.'s] mother supported the [appellant], as did [L.P.]. [T.P.] felt "caught in the middle." The family was under financial pressures as a result of [appellant's] convictions and incarceration in the county jail. [T.P.] was under extreme stress and experiencing emotional difficulties at the time. The recantation arising under these circumstances is unreliable.

[T.P.'s] recantation of her trial testimony to her social worker on August 18, 1986 is inconsistent with her trial recantation.
\* \* \*

The psychological evaluation of [T.P.] \* \* \* is consistent with [T.P.'s] trial testimony that [appellant] sexually abused her. The psychological evaluation shows that [T.P.] was caught in an emotional web as a result of the abuse and her reporting of same; that she felt "caught in the middle" and was disbelieved by her mother who was protective of her father; that she received no support from her mother and her sister and was essentially abandoned by other family members. [T.P.'s] relative position in relation to other family members deteriorated after the trial and placed her in an exceeding vulnerable position in which she was extremely susceptible to pressure from her mother and her sister.

[T.P.'s] recantation of her trial testimony by way of an affidavit dated August 22, 1986 was made under highly suspicious circumstances based upon [T.P.'s] contacts with [appellant's] attorney and her mother's attorney.

\* \* \* \* \* \*

That [T.P.] was living under emotional stress at the time she made the recantation is further borne out by the psychological evaluations of her mother and her sister. [L.P.'s] evaluation shows she minimized her own victimization and aligned herself with her father against her sister; that [L.P.] was unwilling to report or do anything that could be used against her father. The evaluation of Mrs. Potter shows that she had chosen to believe and support her husband over her daughter and therefore had aligned herself with her husband and his interests. Mrs. Potter was "certain her daughters did not want their father to go to jail." [T.P.'s] recantation of her trial testimony is not genuine.

[T.P.'s] recantation of her trial testimony is not credible based upon all of the evidence.

The post-conviction court concluded that T.P.'s recantation was doubtful and not genuine, stating:

Having had the opportunity to observe [T.P.'s] demeanor during her trial testimony and her Post-Conviction testimony; having been informed of the family dynamics surrounding [T.P.]; and reviewing the psychological evaluations of the family, this Court has no reasonable doubt that [T.P.'s] trial testimony was truthful.

### ISSUES

1. Did the post-conviction court abuse its discretion in denying appellant a new trial based on the recantation of the victim's trial testimony?

2. Did the post-conviction court err in denying appellant's request for an adverse psychological examination of the victim?

3. Did the post-conviction court abuse its discretion in considering evidence that the victim's sister had previously recanted her claim that she was sexually abused by her father?

### ANALYSIS

#### I.

█ As a general rule, a trial court should not grant a new trial based on re-canted trial testimony unless the court is reasonably certain the recantation is genuine. *State v. Walker,* 358 N.W.2d 660, 661 (Minn.1984). Courts view recanted testimony with suspicion because of the possibility that it was obtained through coercion. *State v. Caldwell,* 322 N.W.2d 574, 585 n. 7 (Minn.1982). *See State v. Whiteside,* 400 N.W.2d 140, 146 (Minn.Ct.App.1987), *pet. for rev. denied,* (Minn. Mar. 18, 1987).

A trial court may grant a new trial based on recanted testimony if (a) the court is reasonably well satisfied the testimony given by material witness is false; (b) that without it the jury might have reached a different conclusion; and (c) the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after trial. *Caldwell,* 322 N.W.2d at 584–85.

The trial court here had an opportunity to observe T.P.'s demeanor both during the jury trial and during the post-conviction hearing. Its findings and conclusions are commendably thorough and are well supported by the record. *See Hanson v. State,* 344 N.W.2d 420, 423 (Minn.Ct.App. 1984). Further, the trial court evinced a sensitive appreciation of the possibility that a child who reports abuse by a family member may be subject to several types of pressure, all of which are included within what has come to be termed the child abuse syndrome. We, too, recognize that additional misfortune may exist for the reporting child. The reported abuse itself may involve physical injury and emotional trauma, often accompanied by baseless feelings of guilt and self-accusation. The investigation of the reported abuse and necessary interrogation of the child by law enforcement personnel, social workers, physicians, psychologists and psychiatrists, unless sensitively and scrupulously conducted, may invoke additional uneasiness and perplexity in a child. Finally, it is possible that other family members, fearing that removal of a parent, even the abusing parent, from the home will have substantial adverse financial and psychological consequences for the

family unit, may exert pressure upon the complaining child to recant his or her testimony, and thereby permit the family unit to remain "intact." This last pressure, added to those already present for the child, may be impossible to withstand.

Ultimately, the post-conviction court concluded that T.P.'s recantation was not genuine and that her trial testimony was true. The post-conviction court, having observed the family dynamics, was in the best position to determine whether T.P. had been coerced to retract her testimony. We will not disturb the court's well-supported determination.

## II.

█ Dr. Maudal examined T.P. about one month before trial in conjunction with juvenile court proceedings to determine her psychological adjustment and treatment needs. Appellant claims the post-conviction court erred in refusing to subject T.P. to another psychological examination for use in the post-conviction court proceeding. We have not been cited to any authority requiring a court to order a child sexual abuse victim to undergo an adverse psychological examination for use in a post-conviction court proceeding, especially when such an examination was already conducted only one month before trial by a court-appointed doctor.

In related contexts, the decision to order a psychological examination of a child sexual abuse victim for competency determination has been deemed discretionary with the trial court. *State v. Bird*, 292 N.W.2d 3, 5 (Minn.1980); *State v. Sullivan*, 360 N.W.2d 418, 423 (Minn.Ct.App.), *pet. for rev. denied*, (Minn. Apr. 12, 1985). *See also In the Matter of the Welfare of R.B. and B.B.*, 369 N.W.2d 353, 357 (Minn.Ct. App.1985) (in neglect proceedings order of physical or mental examination of children is within the juvenile court's discretion). The post-conviction court was in the best position to determine whether T.P. should be compelled to undergo an adverse psychological examination. Its decision that she should not be so compelled was an appropriate exercise of discretion.

█ Appellant claims an adverse psychological examination would have given an informed opinion on whether T.P. was coerced or pressured into recanting. However, the question of whether T.P.'s trial or post-conviction testimony is the truthful version was not a proper subject on which an expert should express an opinion. *See State v. Myers*, 359 N.W.2d 604, 611 (Minn. 1984) (expert testimony regarding truth or falsity of a witness's allegations about a crime is improper).

█ Finally, appellant argues that Dr. Maudal was permitted at the post-conviction hearing to testify improperly regarding T.P.'s veracity. A review of the record reveals that on two occasions the trial court sustained appellant's objections to questions relating to T.P.'s veracity. On a third occasion, the court overruled an objection to a question regarding pathologic or chronic lying by T.P. The question did not address T.P.'s veracity concerning the allegations before the court, and we cannot conclude that the court abused its discretion in allowing the testimony.

## III.

█ Appellant argues the evidence regarding L.P.'s recantation was inadmissible *Spreigl* evidence which should not have been admitted at the post-conviction court proceedings. The post-conviction court did not abuse its discretion in ruling that this evidence was relevant in presenting to the court a full view of the family's dynamics and to assist it in assessing the reliability of T.P.'s recantation.

## DECISION

The post-conviction court did not abuse its discretion in denying appellant's motion for a new trial which was based on the recantation of the victim's testimony. The post-conviction court did not err in its evidentiary rulings denying appellant an adverse psychological examination and ruling that evidence that the victim's sister had also recanted sexual abuse allegations of

their father was admissible at the post-conviction court proceeding.

Affirmed.