604 A.2d 89
STATE OF NEW JERSEY, PLAINTIFF–APPELLANT,
v. D.R.H., DEFENDANT–RESPONDENT.

Argued October 21, 1991—Decided April 2, 1992.

*Gilbert G. Miller,* Assistant Prosecutor, argued the cause for appellant (*Nicholas L. Bissell, Jr.,* Somerset County Prosecutor, attorney).

*Thomas A. Pavics* argued the cause for respondent (*Schachter, Trombadore, Offen, Stanton & Pavics,* attorneys).

*Debra L. Stone,* Deputy Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*Robert J. Del Tufo,* Attorney General, attorney).

*William C. Cagney* submitted a brief on behalf of *amicus curiae* Association of Criminal Defense Lawyers of New Jersey (*Lane & Mittendorf,* attorneys; *William C. Cagney* and *Cheryl B. Feldmus,* of counsel and on the brief).

The opinion of the Court was delivered by

HANDLER, J.

In this criminal case, the defendant is charged with the sexual abuse of a young child. The central issue on appeal is whether a child victim of sexual abuse may be compelled, at the request of the defendant, to submit to a physical examination for evidence relating to such abuse.

The defendant in this case had been indicted for first degree sexual offenses based on the alleged sexual abuse of a ten year-old girl. Shortly after the alleged abuse, she was exam-

ined by a physician at the State's request. According to the physician's report, the results of the examination were consistent with the allegations of sexual abuse. The defendant then sought to have the child examined by his own physician. The victim, however, refused to undergo another physical examination. Following a hearing, the trial court ordered that the child submit to a physical examination. When she persisted in refusing, the trial court dismissed the indictment. On appeal by the State, the Appellate Division affirmed the dismissal of the indictment. 248 *N.J.Super.* 1, 589 *A.*2d 1353 (1990). This Court granted the State's petition for certification to consider the validity of the rulings of the trial court. 126 *N.J.* 326, 598 *A.*2d 885 (1991).

## I

The alleged victim, K.V., was ten years old in 1988. Her parents were divorced, and she and her brother lived with their father and his wife in Westfield. K.V.'s mother lived with her boyfriend, D.R.H., the defendant, in Bridgewater. K.V. and her brother frequently spent the night at their mother's home. On May 2, 1989, both children told their father, R.V., that they had seen defendant abusing their mother. K.V. also described the sexual abuse defendant had inflicted against her. R.V. reported to "the authorities" that K.V. told him that defendant had fondled her breasts and had inserted his finger into her vagina. On May 11, 1989, detectives from the Somerset County Prosecutor's Office interviewed K.V. She told them that twice between Halloween and Thanksgiving 1988, defendant had placed his finger inside her underpants and penetrated her vagina with his finger, and also had touched her breasts on one occasion. She said that he told her not to tell anyone about these incidents.

At the request of the prosecutor's office, K.V. was taken to Dr. Joseph Smith for an examination. Dr. Smith reported the results of his physical examination of K.V.:

Physical exam revealed a very pleasant, intelligent young white female in no acute distress, however she was visibly sobbing at times and saddened. General physical exam is entirely within normal limits. There was noted on the skin no abnormal scratches or scars. There was no trauma noted to the breast area. The vaginal exam reveals there to be no obvious scarring around the labia or externally over the mons pubis. The hymenal ring does appear to be broken with a vertical measurement of 1 cm. and a horizontal measurement of 7 mm. for the opening. There was no abnormal discharge noted. The rest of the pelvic gynecologic exam appeared to be normal. There was no evidence of any problems in the anus area or the rectal area.

Dr. Smith's report recounted the history related by K.V. According to Dr. Smith, K.V. spoke of defendant "coming in to her room at night lifting up her nightgown and rubbing his hand over her vaginal area. She did claim there was finger penetration both times this occurred, maybe 5–10 minutes duration she said." The report added that "there was never any physical abuse to the patient according to her.... The patient said that this boyfriend of her mother claimed she, (the patient) could not tell anyone because she might get in trouble if she did. That was what her reluctance was to bring these matters up earlier."

Dr. Smith's report concluded in large print:

MY IMPRESSION IS THAT THE ALLEGED PENETRATION ON TWO OCCASIONS BY THE FINGER OF THE PERPETRATOR WOULD BE CONSISTENT WITH THE EXAMINATION WHICH WAS JUST DONE AND THEREFORE THE HISTORY GIVEN BY THE CHILD, K.V. IS CONSISTENT WITH THE PHYSICAL EXAM.

On May 11, 1989, K.V. made an audio and videotaped statement to police interviewers, during which she described the alleged abuse. She said that on the first occasion, she was sleeping and defendant shook her shoulder to wake her, then inserted his finger into her vagina. K.V. said she knew it was defendant because she recognized his voice and could see him in the light from outside of her room. She told investigators she was afraid that defendant would injure her or her mother based on her having witnessed defendant assault her mother in the past. During the second incident, K.V. said defendant pulled the covers up but did nothing further. During the interview,

K.V. also marked and initialed drawings to indicate where and with what body parts defendant had touched her.

On the same day, K.V.'s mother also spoke with investigators in a tape-recorded interview. She described a pattern of physical abuse personally inflicted upon her by defendant. She added that defendant told her that he had once fondled K.V.'s vagina with K.V.'s permission, and that he planned to rape K.V. and then sell her to a South American prostitution ring.

Defendant was indicted on June 15, 1989, and charged with two counts of first degree aggravated sexual assault, contrary to *N.J.S.A.* 2C:14-2a. Defendant was extradited from Florida, where he was serving time on separate charges, and incarcerated pending trial. K.V.'s mother began visiting defendant in jail. She soon retracted her allegations against defendant. While K.V. was visiting, K.V.'s mother put K.V. on the phone with defendant, who was in jail. She also brought K.V., escorted by one or both of defendant's parents, to defendant's attorney's office. K.V. allegedly wrote and signed a retraction note. The note, notarized on July 11, 1989, said: "Nothing happened. I just wanted to protect my mom."

Defendant made a motion to have K.V. examined by a physician selected by him. On August 29, 1989, K.V.'s father wrote to the prosecutor that he adamantly opposed a second examination. R.V. wrote that

[p]rior to her first examination, I requested that it be done by a woman. I was assured by the detectives that it would be. I assured [K.] that it would be. Nevertheless, it turned out to be a male doctor.... [K.] was humiliated, angry and disillusioned. As is often the case for young children, she felt violated by the male doctor. It turned out to be another traumatic experience for her.

He added that at the very least, any required examinations should be performed by a woman doctor.

On September 19, 1989, the trial court received another note from K.V.:

Dear Judge, I'm not going to be examined again. They already put me through enough. Why would I have to be examined if nothing happened to me. I don't understand why they don't just drop this. I don't know any one my age who

has been put through as much as me. I'm never going to see another doctor or psychologist again.

The trial court granted defendant's motion to compel a second examination, finding that a physical examination would not be harmful to K.V. The State appealed, and on November 8, 1989, the Appellate Division summarily remanded the matter to the trial court to provide K.V. with an opportunity to be heard. After the remand, the trial court received another letter from K.V., which stated:

I just wanted to write you again to let you know that I can't understand why you still didn't drop the charges. Because of all this stupid charges I can't even see my mom. Even when nothing happened to me. If it will help you understand better I'll talk to you in person. I just don't want to see [the defendant] to go jail for something he didn't do. Sincerely—

The trial court also received a letter from K.V.'s father describing the trauma experienced by K.V. In the letter, R.V. said he was unaware of K.V.'s letters to the judge until after they had been sent, and that K.V.'s mother had given K.V. the impression that R.V. had requested the examination.

At the post-remand hearing on December 7, 1989, K.V. testified that she did not want to undergo the examination "because nothing happened to me." In response to questions, K.V. said that she had made up the initial allegations because she wanted to protect her mother and have defendant taken away. She also stated that she had not spoken with her mother about the case.

The trial court, finding that K.V. would not be harmed by a physical examination, again granted defendant's motion and ruled that it would dismiss the indictment if K.V. did not submit to a second examination by January 8, 1990. K.V. refused to go with her mother to the appointment scheduled by defendant's attorney. The court then dismissed the indictment.

On appeal, the Appellate Division affirmed. 248 *N.J.Super.* 1, 589 *A.*2d 1353. It reasoned that where the State sought to prove an essential element of a first degree crime with a report of the medical examination as the sole piece of corroborating evidence, defendant was entitled to a second medical opinion.

The court determined that on balance, defendant's right to challenge the first examination outweighed K.V.'s right to privacy.

## II

■ In general, a defendant in a criminal case is entitled to broad discovery. *R.* 3:13–3. Additionally, this Court has confirmed the judiciary's inherent power to order discovery in the context of a criminal prosecution "when justice so requires." *In re W.C.*, 85 *N.J.* 218, 221, 426 *A.*2d 50 (1981).

Nevertheless, criminal discovery has its limits. For example, defendants cannot transform the discovery process into an unfocused, haphazard search for evidence. *See State v. R.W.*, 104 *N.J.* 14, 28, 514 *A.*2d 1287 (1986) ("allowing a defendant to forage for evidence without a reasonable basis is not an ingredient of either due process or fundamental fairness in the administration of the criminal laws"). Another significant limitation on defendants' discovery rights is the chilling and inhibiting effect that discovery can have on material witnesses who are subjected to intimidation, harassment, or embarrassment. *R.W., supra,* 104 *N.J.* at 28, 514 *A.*2d 128; *In re W.C., supra,* 85 *N.J.* at 225–27, 426 *A.*2d 50 (1981).

■ The potential harm in the form of emotional trauma and mental distress is an acute concern with respect to a child sex-abuse victim who is required to be a witness in a criminal prosecution for a sexual offense. *See, e.g., State v. Crandall,* 120 *N.J.* 649, 664, 577 *A.*2d 483 (1990) (relying on *Maryland v. Craig,* 497 *U.S.* 836, 110 *S.Ct.* 3157, 111 *L.Ed.*2d 666 (1990) (Court recognized that young children testifying in open court about sexual abuse could suffer severe emotional or mental distress)). That concern was central to this Court's decision in *R.W., supra.* The Court fully recognized the inherent power of the judiciary to order a witness to submit to a psychiatric or psychological examination. Nevertheless, it emphasized that

the exercise of this power is neither frequent nor common, and never lightly undertaken.... The practice of granting psychiatric examinations of witnesses "must be engaged in with great care" and "only upon a substantial showing of need and justification." [104 *N.J.* at 21, 514 *A.*2d 1287 (quoting *State v. Butler, supra,* 27 *N.J.* 560 at 605, 143 *A.*2d 530 (1985)).]

*R.W.* is consistent with many cases that recognize the serious harms that compelled psychological examinations may inflict on child sex-abuse victims. *See, e.g., Gilpin v. McCormick,* 921 *F.*2d 928, 931–32 (9th Cir.1990); *Anderson v. State,* 749 *P.*2d 369, 371 (Alaska Ct.App.1988); *see also Potter v. State,* 410 *N.W.*2d 364, 368 (Minn.App.1987) (investigation of reported abuse by psychologists may invoke uneasiness and perplexity in a child). *See generally* Gregory G. Sarno, Annotation, *"Necessity or Permissibility of Mental Examination to Determine Competency or Credibility of Complainant in Sexual Offense Prosecution,"* 45 *A.L.R.* 4th 310 (1986) (collecting cases).

In this case, the trial court concluded that K.V.'s privacy interests were not in jeopardy and no harm would flow from a compelled physical examination. It acknowledged the holding of *R.W.,* that a compelled psychiatric examination of a child sex-abuse victim is an extraordinary measure because of the child's important privacy interests, and is therefore permissible only on a showing of substantial need. However, the trial court concluded it was not bound by that standard because a physical examination was different from a psychiatric examination with respect to the possible harmful consequences for the child. It observed:

But here we are dealing with a physical exam, and I don't see any harm to the child. I would assume that children go to doctors repeatedly, have examinations, including examination of their privates and other sensitive parts of the body. I don't see how this could be harmful to the child. The child has gone to a doctor in the past and I am sure will go to the doctor many times ...

The trial court, following the hearing on remand, reiterated that view, *viz:*

Nothing has been brought to my attention, other than the bare unsubstantiated assertions of the young girl and her father, that there is something traumatic

that will happen if she submits to a physical exam by a doctor, a female doctor, under circumstances in a hospital or in a doctor's office.

\* \* \* \* \* \* \* \*

So while in other cases and other circumstances an examination may raise some questions, I really cannot say or see how it could be said that in this case it would be unfair—or as you said, a shame—to compel this young girl—who is now twelve years of age—to submit to a physical exam only by a female doctor. I don't understand.

We find that reasoning unpersuasive. Many courts have concluded that physical examinations of child sex-abuse victims generate the *same* harmful consequences that arise from psychological examinations. For example, in *People v. Woertman,* 786 *P.*2d 443 (Colo.App.1989), *rev'd on other grounds,* 804 *P.*2d 188 (Colo.1991), the defendants requested an additional physical examination of the child sex-abuse victim. Reasoning from another case dealing with the effect of psychological examinations, the court found that

the nature of the inquiry [*i.e.,* a physical examination], although for a different purpose, is invasive and thus accompanied by the same possible emotional trauma, embarrassment, or intimidation as experienced with a psychological exam.... [786 *P.*2d at 449.]

*See People v. Chard,* 808 *P.*2d 351, 355 (Colo.1991) (intrusive nature of physical examination raises same concerns about emotional trauma and embarrassment that are present in a psychological examination); *State v. Joyce,* 97 *N.C.App.* 464, 389 *S.E.*2d 136, 139 ("submitting to a physical examination may well be an even greater invasion of a witness's privacy than a psychological examination"), *review denied,* 326 *N.C.* 803, 393 *S.E.*2d 902 (1990); *State v. Ramos,* 553 *A.*2d 1059, 1062 (R.I. 1989) (gynecological examinations of minors are "both intrusive and embarrassing"); *People v. Beauchamp,* 126 *Misc.*2d 754, 483 *N.Y.S.*2d 946, 948 (Sup.Ct.1985) (court should make sensitive and compassionate balance of rights because "children are not discoverable items"), *modified on other grounds,* 74 *N.Y.*2d 639, 541 *N.Y.S.*2d 977, 539 *N.E.*2d 1105 (1989).

The trial court, we conclude, clearly erred in determining that with respect to a child sex-abuse victim, a physical examination relating to the alleged abuse does not constitute an invasion of

privacy and does not create a substantial risk of serious harm to the child in the form of emotional trauma and mental distress. The harmful consequences of a physical examination on child sex-abuse victims dictate that a criminal defendant cannot insist on untrammelled or unconditional discovery rights to such an examination.

The Court in *R.W., supra,* explicitly recognized the delicate balance that must be struck between the defendant's entitlement to discovery and a child victim's wellbeing:

The court must balance the possible emotional trauma, embarrassment, and intimidation to the complainant, particularly an extremely young child, against the likelihood that the examination will produce material, as distinguished from speculative, evidence. [104 *N.J.* at 28, 514 *A.*2d 1287.]

It accordingly required "a substantial showing of need and justification" by the defendant in order to obtain a psychiatric examination of a child sex-abuse victim. *Id.* at 21, 514 *A.*2d 1287. We are satisfied that the same test should govern a criminal defendant's entitlement to a physical examination of child sex-abuse victims.

Other jurisdictions have also recognized that in light of the invasive nature of physical examinations and the likelihood of emotional trauma and mental distress, the wellbeing of child sex-abuse victims demands heightened protection, and that physical examinations should not be required absent compelling or substantial need. *See Lanton v. State,* 456 *So.*2d 873, 873–74 (Ala.Crim.App.1984) (the defendant must show "extreme necessity" for physical examination of child sex abuse victim), *cert. denied,* 471 *U.S.* 1095, 105 *S.Ct.* 2314, 85 *L.Ed.*2d 834 (1985); *Woertman, supra,* 786 *P.*2d at 449 (defendant required to present compelling reason for physical examination of ten year-old child); *State v. Garrett,* 384 *N.W.*2d 617, 619 (Minn. App.1986) ("[o]nly a rare case would justify such an order based upon a showing of compelling need"); *State v. Hewett,* 93 *N.C.App.* 1, 376 *S.E.*2d 467, 471 (1989) (same); *see also State v. Ramos, supra,* 553 *A.*2d at 1062 (several considerations are relevant in assessing effect of physical examination, including

complainant's age, remoteness in time of alleged criminal incident to proposed examination, degree of intrusiveness and humiliation associated with procedure, potentially debilitating physical effects of such examination, and any other relevant considerations).

■ The inquiry into whether a defendant charged with the sexual abuse of a child has a substantial need for a physical examination of the child must focus on the likelihood that such an examination will produce competent and probative evidence. *Turner v. Commonwealth*, 767 *S.W.*2d 557, 559 (Ky.1988), *cert. denied*, 493 *U.S.* 901, 110 *S.Ct.* 260, 107 *L.Ed.*2d 209 (1989), illustrates that kind of inquiry. The court there ruled that the defendant could require his four year-old daughter, the alleged victim to be examined by an independent gynecologist even though a physical examination had already been made. The court, while acknowledging the importance of protecting victims from harassment, stated:

> In this case, a physical examination of the four year-old child might have disclosed evidence to completely refute the charge, and at the very least, would have been of enormous benefit to the appellant in the conduct of the trial. In our view, this outweighs the potential for harm expressed above. [*Ibid.*]

According to the court, a physical examination by an independent expert was warranted because evidence of tears in the hymenal ring of a four year-old child and testimony by the examining physician that penile penetration had caused the injury were significant incriminating factors. *Ibid.* The court believed that a second examination could enable the defendant to contradict that injuries to the hymenal ring had occurred and even if such an injury were found, the examination could enable the defendant to contradict the State's testimony that the location of the injuries indicated the probability of penile penetration. *Ibid.*

■ Consequently, we hold that courts may order the physical examination of a child sex-abuse victim only when satisfied that the defendant has made a sufficient showing that such an examination can produce competent evidence that has substan-

tial probative worth, and if admitted and believed by the trier of fact, that evidence could refute or neutralize incriminating evidence or impugn the credibility of prosecution witnesses. Further, the court must be satisfied that the defendant's need clearly outweighs the possible harmful consequences to the alleged victim.

### III

The question remains whether defendant has demonstrated a substantial need for a physical examination of K.V. that clearly outweighs possible harmful consequences to her.

Defendant asserts, in effect, that no facts support the prosecutor's allegation that a second examination would create harmful consequences. However, the record fairly reveals a risk of harm to K.V. in the form of an invasion of privacy with attendant embarrassment, discomfort, and humiliation. Moreover, even through K.V. currently denies the occurrence of any sexual abuse, we cannot discount the possibility of emotional trauma and mental distress arising from another physical examination.

The State's physician, in conducting the physical examination of K.V., pointedly questioned her about the alleged incidents of sexual abuse. Further, K.V.'s letters to the trial court indicate that although K.V. denied the occurrence of sexual abuse, she found the examination embarrassing and humiliating. Her father, R.V., recounted the humiliation, embarrassment, and suffering endured by K.V. from the abusive incidents, which were compounded by the initial physical examination. Such an examination is inherently invasive and the record indicates the likelihood that it will engender significant emotional trauma and mental distress to K.V. We may acknowledge that an assessment of those harms is difficult, but we have no difficulty in concluding that they are not meretricious or illusory. However much weight one assigns to such consequences, they should be avoided in the absence of a substantial need by

defendant to subject K.V. to an examination that clearly outweighs whatever detrimental effects the victim may suffer.

Defendant's primary argument is that the substantial need to have K.V. examined by his own expert physician arose *because* the prosecution had K.V. submit to an examination and intended to use evidence from the examination in its case against defendant for a first degree crime. The Appellate Division reasoned that the results of the first examination were critical to the State's case and warranted a counterbalancing examination on behalf of defendant. The trial court commented that even if the State were not to use any evidence from the initial examination, the defendant would be entitled to an examination given the serious nature of the charges. The somewhat varying positions of the lower courts, however, are based on a premise that is not tenable. They posit the entitlement to such an examination without an assessment of the actual and realistic evidentiary need for it. There is, we conclude, no automatic or *per se* entitlement to a reciprocal physical examination of a child sex-abuse victim. The right to such an examination depends on a demonstration of substantial need grounded in the evidentiary worth of such an examination.

As mentioned earlier, *Turner v. Commonwealth, supra,* illustrates the kind of need that must be shown to compel the physical examination of a child sex-abuse victim. *Supra* at 260–261, 604 *A.*2d at 95. The court in *Turner* believed that the second examination could yield results that might actually contradict the incriminatory impact of the earlier examination. Still, the court acknowledged that an examination in a case that involved equivocal physical conditions or that was remote in time from the alleged sexual abuse would reveal "little of probative value as to whether sexual assault had occurred." 767 *S.W.*2d at 559. The facts of that case, which impelled the court to authorize a second examination of the child victim, do not parallel those posed by the record before us. To the contrary, a majority of courts have refused to compel physical

examinations of child victims of sexual abuse under circumstances similar to those in this case.

In *Chard, supra,* 808 *P.*2d at 356, the court considered the defendant's arguments that a second physical examination of the child victim was necessary because it would: (1) demonstrate the presence or absence of ongoing contact and whether the contact was self-induced or induced by another; (2) allow for additional examination techniques not previously used; and (3) provide expert opinion on the accuracy of the results obtained by the state's examining physician. *Ibid.* The court rejected those contentions, concluding that any evidence discovered through a second examination would be speculative and "could at best produce results equivocal on the defendant's innocence." *Ibid.* (quoting *People v. Nokes,* 183 *Cal.App.*3d 468, 228 *Cal.Rptr.* 119, 127 (1986)). In *Ramos, supra,* 553 *A.*2d at 1062, the court ruled that a second physical examination by the defendant for the purpose of demonstrating that the child's hymen was still intact was unnecessary, concluding that four years had elapsed since the sexual assaults had occurred and the State could rely on the victim's testimony and was not required to prove that the victim's hymen had been ruptured in order to show sexual assault. *See also State v. Hewett, supra,* 376 *S.E.*2d at 471–72 (court refused request of defendant, charged with sexual abuse of his eight and nine year-old children, to submit children to second physical examination by defendant's own expert; court relied on fact that last incident of alleged abuse had occurred six months before and that defendant did not offer expert opinion to show need for additional examination); *State v. Farr,* 558 *So.*2d 437, 437–38 (Fla.Dist.Ct.App.1990) (rejecting request for second examination as of little probative value and not in child's best interests).

In this case, the alleged sexual assault occurred more than three years ago and therefore any physical examination would be remote in time from the alleged occurrence. K.V. is now twelve years old and, presumably, has experienced considerable normal growth and development that would likely have altered

the bodily conditions that would be subject to examination. Furthermore, the first physical examination indicated only that the hymenal ring was broken. That a second physical examination could possibly either confirm or refute the earlier finding has not been shown or suggested. Nor has it been indicated that a second physical examination as such could be essential to interpret or counter the incriminatory implications of the physical condition revealed by the first examination.

Moreover, there has been no suggestion that given the results of the first physical examination, a medical doctor testifying on behalf of the defendant, even without an independent examination, could not credibly and persuasively challenge the conclusions of the State's doctor. In *State v. Drab*, 546 *So.*2d 54 (Fla.Dist.Ct.App.), *review denied,* 553 *So.*2d 1164 (Fla.1989), the court rejected the defendant's request for a compelled second examination, noting that the defendant did not allege that the first examination had been improper or unscientific, but rather faulted the expert's conclusion that the findings supported allegations of sexual abuse:

> [Defendant's] concern is mainly with the relative weight that might be given by a jury to testimony from one expert who has made a physical examination and another who has not. In our view, this falls far short of justification for a compelled examination. [*Id.* at 56.]

In addition, we note that the first physical examination contained a history given by K.V. and the doctor's conclusions concerning the occurrence of sexual abuse based in part on that history. However, defendant has not demonstrated a substantial need for a second physical examination relating to those aspects of the State's examination. Furthermore, it is questionable whether the medical history related by K.V. in the first examination, or the doctor's conclusions concerning the occurrence of abuse based on K.V.'s history, would be admissible. *See State v. D.R.*, 109 *N.J.* 348, 537 *A.*2d 667 (1988) (rule requires sufficient indicia of reliability of child's statements made to examining doctor and if child is unavailable as witness, admissible credible evidence corroborating act of sexual abuse).

*Evid.R.* 63 (33). Nor would that history likely be admissible under the "fresh complaint" doctrine. *See, e.g., State v. Bethune,* 121 *N.J.* 137, 578 *A.*2d 364 (1990) (statements made by child victim directly in response to coercive questions are inadmissible). Finally, one may infer that K.V., if called as witness, will contradict the history that she related during her physical examination, as well as her videotaped statement, in which she recounted defendant's acts of sexual abuse. That K.V.'s medical history would be admissible as a prior inconsistent statement should she recant is not at all obvious. *See State v. Gross,* 121 *N.J.* 1, 577 *A.*2d 806 (1990) (prior inconsistent statement made by witness admissible only under circumstances establishing its reliability). Thus, defendant does not require a second physical examination in an attempt to elicit evidence to refute the incriminating statements made by K.V. in the course of the first examination; K.V. can be expected to do that if called as a witness.

In sum, defendant has not demonstrated a substantial need for a physical examination grounded in its evidentiary worth that clearly outweighs the need to protect K.V.'s wellbeing.

Finally, we note the State's argument that the trial court's dismissal of the indictment against defendant was improper because it was based on K.V.'s refusal to submit to a second examination. Defendant argues that the trial court had inherent power to dismiss the indictment under the circumstances, and that because the dismissal was discretionary, appellate courts may reverse the decision only if it was clearly in error. In view of our determination that defendant has failed to demonstrate a valid basis for a physical examination, we find that the trial court's dismissal of the indictment based on the refusal of K.V. to submit to such an examination must be reversed.

We reverse the judgment of the Appellate Division, reinstate the indictment, and remand the matter to the Law Division for further proceedings.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.