785 A.2d 450

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. R.D., DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted April 11, 2000—Decided May 10, 2000—Remanded
by the Supreme Court July 16, 2001—Resubmitted
October 30, 2001—Decided December 4, 2001.

Before Judges WEFING, CIANCIA and PARRILLO.

*Peter A. Garcia*, Acting Public Defender, attorney for appellant (*Willliam F. Mueller*, Designated Counsel, and *Matthew A. Schiappa*, on the brief).

*John J. Farmer, Jr.*, Attorney General, attorney for respondent (*Kristen A. McKearney*, Deputy Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

CIANCIA, J.A.D.

This appeal is before us on remand from the Supreme Court. *State v. R.D.*, 169 *N.J.* 551, 781 *A.*2d 37 (2001). Defendant was convicted of second-degree sexual assault upon his seven-year-old granddaughter, *N.J.S.A.* 2C:14–2b, and related offenses. Initially, we reversed defendant's judgment of conviction finding plain error in the trial court's failure to interrogate other jurors as to possible taint when it excused one juror who recollected after the start of trial that he had attended the victim's mother in the hospital as a nurse. That juror heard her talk about family relationships in such a way as to influence his view of the case. The Supreme Court reversed, holding that the trial court had not abused its discretion in determining that a voir dire of the remaining jurors was unnecessary. The matter was remanded to this court for consideration of the remaining issues defendant raised on direct appeal that had not been addressed in our initial opinion. Those issues are:

> POINT II DEFENDANT'S CONVICTION MUST BE REVERSED BE-
> CAUSE THE TRIAL COURT IMPROPERLY PRECLUDED DEFENSE
> COUNSEL FROM INTERVIEWING A WITNESS/JUROR.

POINT III DEFENDANT'S CONVICTION MUST BE REVERSED BECAUSE THE TRIAL COURT IMPROPERLY ALLOWED THE CHILD, F.D., TO TESTIFY OUTSIDE THE PRESENCE OF THE DEFENDANT BY CLOSED CIRCUIT TELEVISION.

POINT IV  DEFENDANT'S SENTENCE IS EXCESSIVE.

■ We find merit in the contention that defense counsel was improperly precluded from interviewing the excused juror, but on the present facts reversal of defendant's judgment of conviction is not warranted. Instead, we find defendant is entitled to an immediate evidential hearing upon an application for post-conviction relief.

The circumstances surrounding excusal of the juror are as follows. The victim's mother suffered from sickle cell anemia and was hospitalized on more than one occasion. At the conclusion of testimony on the first day of trial, which included testimony from the victim's mother, juror number two approached the bench at sidebar and told the court that he belatedly realized he knew the victim's mother. The following colloquy took place in the presence of counsel:

THE JUROR: In the beginning of the trial when you read all the names, I didn't recognize anybody. I know [the victim's mother] because I took care of her. I'm a nurse at the Mountainside Hospital and had her for a week.

THE COURT: [ ], the witness who just testified, is the mother of the alleged victim in this matter. You took care of her in Mountainside Hospital that night or on some other occasion?

THE WITNESS [sic]: No. I can't remember the dates. I took care of her about a week for the sickle cell.

THE COURT: All right. And was she your patient for a week?

THE JUROR: Yeah.

THE COURT: Other than treating her or whatever, what did your contact with her consist of, just so we know?

THE JUROR: I gave her pain medicines and—what troubles me is I overheard things about her relationship with her family.

THE COURT: During the course of that?

THE JUROR: And I formed an opinion, and I don't know, that's my problem.

THE COURT: I understand. You have some concern as to whether—now that you realize who she is, whether you could remain objective in this matter?

THE JUROR: My problem is that I formed an opinion way back then of some sort, that when you [sic] I see her up here, then I think back what happened

outside the courtroom.  Just things that I heard, and, you know, I mean it's hard for me—

THE COURT:  Have you discussed this with any of the other jurors?

THE JUROR:  No.

THE COURT:  All right.  Then of course I'm going to ask you not to do that.  Let me talk to the lawyers briefly to see what they wish to do.

Before juror number two was actually excused, defense counsel stated to the court that he wanted to "investigate what he [the juror] mean[t] by family problems."  The following dialogue occurred between the attorneys and the judge:

[THE PROSECUTOR]:  She has been in the hospital periodically for years.  In fact, she was there in December.  He said he doesn't know when it took place.  There's nothing to suggest that what he overheard was at the time she was in the hospital, and there's nothing to suggest that the family problems that she [sic] overheard had anything to do with this case.

[DEFENSE COUNSEL]:  Maybe it was just money problems.  I think I have to investigate that.

THE COURT:  Okay. I understand your request, but if your request is that after I excuse this person as a juror, you want to interview the juror as to what he's indicated, specifically during the course of the week he treated her as a nurse at Mountainside Hospital, presumably for sickle cell anemia, he recalls now that he heard her saying things about family problems, I don't think that's enough of a showing, number one.  I mean, to allow you to investigate a possible juror, question a juror, or perhaps have some investigator question a juror, I don't think the requirements of rule 1:16 are met in interviewing jurors.  And number two, I think it would be highly unusual, if not bizarre, to perhaps turn a juror in a case into a potential witness in a case, based on some unsubstantiated, uncorroborated, alleged hearsay.

The most he could possibly do is tell you what he heard her say about some unspecified family problems.  We don't know what it related to, or what time period it may relate to.

[DEFENSE COUNSEL]:  Judge, I don't know entirely the basis for interviewing a juror at this point.  I think you're absolutely correct, I couldn't—suppose I was—he said, oh, she was discussing the abuse of her child by her step husband.  I couldn't bring that juror in as a witness, and this trial would have to be a mistrial.  But I just think at some time he has to be interviewed, unless the Court wants to do it right now.

THE COURT:  I suppose he overheard her talking about your client sexually abusing her on another occasion, am I going to allow the prosecutor to get involved in that, and start using that against your client?

[DEFENSE COUNSEL]:  Obviously I would object to that.  But the problem is, we don't know what it is.  I think frankly this maybe [sic] something that's left for an appellate situation.  I don't know.

THE COURT: Okay. I am going to leave it for an appellate court. I am absolutely ruling against any interview of this witness—this juror, by any attorney involved in this case, or any agent or investigative agent involved in this case. I'm satisfied that there's no sufficient showing that would warrant that extraordinary course of action.

Juror number two was then excused.

In our view, *R.* 1:16–1 was inapplicable and the trial court should have exercised its inherent power to order discovery in the interest of justice. *State v. D.R.H.,* 127 *N.J.* 249, 256, 604 *A.*2d 89 (1992); *In re W.C.,* 85 *N.J.* 218, 221, 426 *A.*2d 50 (1981). We note that *R.* 1:16–1 is captioned, "Interviewing Jurors Subsequent to Trial." The text of the rule provides, "[e]xcept by leave of court granted on good cause shown, no attorney or party shall directly, or through any investigator or other person acting for the attorney interview, examine, or question any grand or petit juror with respect to any matter relating to the case." Defendant argues that the dangers or harms that the rule was intended to address are simply not implicated in the present circumstances. We agree. The comments to the rule make clear that the purpose of the rule is to "accommodate the public interest both in maintaining the secrecy of jury deliberations and in avoiding gross injustice by permitting inquiry into the events surrounding the jury's decision only where" a showing is made "that misconduct occurred which tainted the verdict." Pressler, *Current N.J. Court Rules,* comment 1 on *R.* 1:16–1 (2002).

The case law that addresses *R.* 1:16–1 is exclusively concerned with preserving the sanctity of jury deliberations and prohibiting attorneys from probing into a jury's thought process "in search of something to invalidate the verdict." *State v. LaFera,* 42 *N.J.* 97, 106–107, 199 *A.*2d 630 (1964) (discussing the necessary protections of jury deliberations); *accord State v. Loftin,* 146 *N.J.* 295, 381, 680 *A.*2d 677 (1996) (discussing the privilege *R.* 1:16–1 affords jurors against disclosure of communications during deliberations); *State v. Koedatich,* 112 *N.J.* 225, 288, 548 *A.*2d 939 (1988) (discussing the dangers in allowing investigations into secret jury deliberations for fear of harassing jurors to induce them to repudiate

their decisions); *State v. Athorn,* 46 *N.J.* 247, 250, 216 *A.*2d 369, *cert. denied,* 384 *U.S.* 962, 86 *S.Ct.* 1589, 16 *L.Ed.*2d 674 (1966) (stating that interrogating jurors after they have been discharged is an extraordinary procedure which should be invoked only upon a strong showing of jury misconduct).

The State's contention that the rule should be read expansively to include the present circumstances, is unpersuasive. The rule was not designed or intended to prohibit communication with an excused juror who professes to have information concerning the case. The integrity of jury deliberations is not at risk when a juror is excused prior to the start of deliberations and, in this case, at an early stage of trial when it is less likely the excused juror would have any insight into the thoughts of the remaining jurors.

The inapplicability of *R.* 1:16–1, however, does not resolve the issue as to whether defense counsel should have been permitted to interview the departing juror. As often happens, competing interests are at stake. The problem is made more difficult here because the content of the juror's knowledge is unknown. On one hand defense counsel cannot transform the discovery process into, "an unfocused, haphazard search for evidence." *State v. D.R.H., supra,* 127 *N.J.* at 256, 604 *A.*2d 89. Allowing a defendant, "to forage for evidence without a reasonable basis is not an ingredient of either due process or fundamental fairness in the administration of the criminal laws." *State v. R.W.* 104 *N.J.* 14, 28, 514 *A.*2d 1287 (1986). *A fortiori,* the discovery process, absent unusual circumstances, should not continue into the trial itself.

On the other hand, a trial is a search for truth and our rules and procedures should be sufficiently flexible to accommodate that search. *See State v. Burnett,* 198 *N.J.Super.* 53, 58, 486 *A.*2d 846 (App.Div.1984), *certif. denied,* 101 *N.J.* 269, 501 *A.*2d 936 (1985) ("The principal purpose of our discovery rules is to assure the parties every legitimate avenue of inquiry prior to trial to enhance the search for truth."). At the start of his dissent in *State v. Williams,* 80 *N.J.* 472, 482, 404 *A.*2d 34 (1979), Justice Schreiber observed that our criminal discovery rules "were designed princi-

pally for the purpose of presenting at trial all relevant and material evidence to assist the fact finder in the search for truth." He then quoted Chief Justice Traynor of the California Supreme Court to the effect that neither side may validly deny, "access to evidence that can throw light on issues in the case. *Jones v. Superior Court,* 58 *Cal.*2d 56, 59, 22 *Cal.Rptr.* 879, 880, 372 *P.*2d 919, 920 (1962)." *Ibid.*

As we indicated, what juror number two heard from the victim's mother while attending her at the hospital cannot be ascertained from the present record. The victim was allegedly assaulted by defendant when the victim's mother was in the hospital and the child was staying with defendant and his family. The mother's condition, however, put her in and out of the hospital on several occasions. The juror's knowledge could have been obtained before or after the assault on the child.

The mother was a significant witness for the prosecution. She testified to the sexual assault in vivid detail, as told to her by the victim. She also repeated the victim's statement that defendant threatened to kill the victim if she told anyone what had happened. The mother described the victim's negative reactions to defendant when they were in court together. On cross-examination the mother said one of defendant's brothers had once attempted to sexually assault her. She also said defendant's wife had accused her of "setting [defendant] up." Other testimony in the case highlighted the complex dynamics at work in the victim's extended family and among friends and neighbors who were close to family members. The possibility of motives being at odds with truth-telling was very real.

Our point is only that a statement by the mother, as overheard by the juror, could have been relevant to the question of defendant's guilt and might have been admissible to impeach the mother's testimony. While it may seem unlikely that the overheard statement would be both relevant and helpful to defendant, the fact is we do not know. We do not know because counsel was not given a few minutes to sit down with the former juror and ask

the simple question: What is it that you heard the mother say? That could have been done in court, in the presence of the prosecutor. If the question produced information that justified calling the former juror as a witness, a mistrial would have been required, *N.J.R.E.* 606, but that possibility was not a basis for denying defense counsel's request to find out if the former juror possessed relevant information. We emphasize that this is not a situation where the defense failed to properly conduct discovery in the first instance and sought to rectify the deficiency in the middle of trial. Here, there was no reasonable way defense counsel might have anticipated that a nurse attending the victim's mother overheard a statement that was possibly relevant.

In our view, the course most likely to have served the interests of justice would have been to allow defense counsel to ask the former juror a few questions in the presence of the prosecutor. The court could have then proceeded to rule from an informed position as to what steps, if any, were necessary. The court's denial of this procedure constituted a mistaken exercise of discretion. Justice Jacobs' statements in *State v. Hunt*, 25 *N.J.* 514, 530, 138 *A.*2d 1 (1958), expressed in the context of a defendant's entitlement to notes made by a witness prior to testifying, are also applicable in the present context:

> In such event, no one would have been harmed by the inspection. On the other hand it might have found significant omissions, different interpretations, or even affirmative inconsistencies, which when pursued, might have brought about a truer and more accurate portrayal before the jury. In such event, the interests of justice would have been considerably advanced.

Here too, there was no potential harm to anyone in allowing defense counsel to find out what the former juror had heard from the victim's mother. The inquiry, if unproductive, would not have delayed the ongoing trial. If relevant information were revealed, the trial court could have determined the appropriate course, which may or may not have entailed a mistrial. We note that the holding in *Hunt* was "grounded not on any specific statute or rule but on the court's inherent power to order discovery when justice

so requires." *State v. Montague,* 55 *N.J.* 387, 398, 262 *A.*2d 398 (1970) (citations omitted).

A remedy for this trial error is difficult to fashion. Prosecutions of this nature are hard on all concerned, the victim, the victim's family and, of course, the accused. Often witnesses are reluctant or unavailable to go through a second trial. A family torn by charges of sexual assault does not easily heal. Yet a defendant is entitled to a fair prosecution. Again, we come back to the point of our discussion: it is impossible to know what the former juror heard. We can no more label the error harmless than we can find it prejudicial. It is entirely possible, perhaps even probable, that the information was not relevant and, if relevant, was not exculpatory. Any reversal of defendant's conviction would have to be premised upon an assumption that a retrial would include the missing information. That assumption is not available to us. We cannot reverse a conviction on a guess and a hope. In our view, the only viable remedy is to allow the exploration now that should have been done during trial. Defendant should have the opportunity to demonstrate that the juror's knowledge was relevant, exculpatory, and admissible. Moreover, at this point, it must also be found to have been capable of altering the jury's finding of guilt. The procedure available to achieve this is an evidential hearing on post-conviction relief. Defense counsel shall be permitted to interview the former juror in anticipation of such a hearing and, if necessary, the former juror may be subpoenaed to testify.

As might be assumed from the preceding discussion, we find no merit in defendant's additional claim that the victim should not have been allowed to testify via closed circuit television. The trial court properly evaluated all the relevant considerations and correctly ruled that closed circuit testimony was warranted. *N.J.S.A.* 2A:84A–32.4; *State v. Crandall,* 120 *N.J.* 649, 577 *A.*2d 483 (1990); *State v. Delgado,* 327 *N.J.Super.* 137, 143–144, 742 *A.*2d 990 (App.Div.2000).

■ We also find no merit in defendant's claim of excessive sentence. Defendant was found guilty of two counts of second-degree sexual assault, *N.J.S.A.* 2C:14–2b; second-degree endangering the welfare of a child, *N.J.S.A.* 2C:24–4; and third-degree terroristic threats, *N.J.S.A.* 2C:12–3. His evaluation at the Adult Diagnostic and Treatment Center resulted in a finding that his conduct was not characterized by a pattern of repetitive and compulsive behavior. Accordingly, he was sentenced in compliance with the provisions of *N.J.S.A.* 2C:47–3d. On each of the second-degree offenses an eight-year term of imprisonment was imposed. On the third-degree offense, a five-year term was imposed. All sentences were to run concurrently. In our view, the sentencing court complied with the applicable provisions of the Criminal Code and exercised appropriate discretion. *State v. Megargel,* 143 *N.J.* 484, 494, 673 *A.*2d 259 (1996); *State v. Roth,* 95 *N.J.* 334, 363–364, 471 *A.*2d 370 (1984).

Defendant's judgment of conviction is affirmed. If defendant seeks post-conviction relief based upon the former juror's knowledge, the petition should be expedited and an evidential hearing afforded.