705 A.2d 373

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. WILLIAM DAVID JONES, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued December 10, 1997—Decided January 27, 1998.

16

Before Judges SHEBELL, D'ANNUNZIO and COBURN.

*Annmarie Cozzi* and *John J. Scaliti*, Assistant Prosecutors, argued the cause for appellant (*William H. Schmidt*, Bergen County Prosecutor, attorney; *Ms. Cozzi* and *Mr. Scaliti*, of counsel and on the brief; *John L. Higgins, III*, Assistant Prosecutor, of counsel).

*David A. Ruhnke*, argued the cause for respondent (*Ruhnke & Barrett*, attorneys; *Jean deSales Barrett* and *Mr. Ruhnke*, on the brief).

The opinion of the court was delivered by

D'ANNUNZIO, J.A.D.

Pursuant to leave granted, the State appeals from pre-trial orders entered on August 5, 1997 in this capital murder prosecution under Bergen County Indictment No. S–1452–95. The orders (1) denied the State's application to permit it to use for impeachment purposes certain of defendant's statements to Officer Ziegler; (2) suppressed certain writings seized at defendant's home pursuant to a search warrant; and (3) ordered the prosecutor to

examine the personnel files of its law enforcement witnesses "for material relevant to credibility and to disclose information relevant to credibility to the defense."

We also granted the State leave to appeal from an August 6 order barring the deputy medical examiner from "offering at trial the opinions set forth in a supplemental report" and ordering that, in the event "the Appellate Division [reverses] this court's ruling ... concerning the opinions set forth in [the medical examiner's] supplemental report, there shall be separate guilt and penalty phase juries empaneled in this matter."

Defendant William Jones is an African–American male, born in September 1973, who lived in Leonia, New Jersey. On July 19, 1995, Sergeant O'Meara of the Leonia Police Department was outside police headquarters when Jones approached him. O'Meara knew Jones and Jones' mother because of their involvement in community sports programs. As Jones approached, O'Meara noticed that Jones was distraught, pale and "shaken up." As O'Meara began to greet defendant, defendant said, "There's been a murder here." O'Meara asked where and defendant said "168 Spring Street." O'Meara then asked defendant whether he was okay and defendant stated, "You don't understand, I'm the bad guy here." As a result of this exchange, O'Meara told Jones to "Stop right there." O'Meara then used a portable communication device and called the dispatcher located in the police headquarters. He told the dispatcher to send Detective Ziegler outside. Ziegler emerged from the building, and O'Meara told him that "We may have a murder here."

As O'Meara, Ziegler and Jones walked into the police building, O'Meara asked whether an ambulance was needed. Defendant said, "No, I'm pretty sure she's dead." Then defendant said, "You'd better send the paramedics." O'Meara told the communication's officer to dispatch the paramedics to 168 Spring Street. O'Meara knew that to be defendant's home address. O'Meara and another officer then left to go to the scene, leaving only defendant, Ziegler and the communication's officer at headquarters.

O'Meara testified that defendant was not under arrest and he was not handcuffed when O'Meara left police headquarters to go to defendant's home. O'Meara further testified that he did not interpret defendant's statement that he was the "bad guy" as an admission of criminal involvement.

Officer Ziegler testified that he did not know Jones. When O'Meara told Ziegler that defendant wanted to tell the police about a murder, Ziegler gave it no credibility because the Leonia police frequently received unfounded information from juveniles about alleged crimes. However, when Ziegler noticed that defendant was pale and shaking, Ziegler then believed that defendant may have been a witness to a crime. O'Meara had not told Ziegler about defendant's statement that he was the "bad guy."

Ziegler and defendant then had the following conversation:

Ziegler: "Are you sure that she's dead?"

Defendant: "Yes."

Ziegler: "Well how do you know that she's dead?"

Defendant: "I checked."

Ziegler: "How did you check?"

Defendant: "I checked her breathing."

During this conversation, defendant, on overhearing a radio communication, said: "Tell them that the front door is open and that the body is in the basement." Ziegler then asked defendant whether anyone else was in the house and defendant replied "no." Ziegler asked defendant whether the victim was defendant's mother and defendant said "no." Ziegler asked whether she was defendant's girlfriend and defendant said, "No, she's just a friend." Ziegler testified that he perceived some reluctance on defendant's part to answer those questions. Ziegler then testified:

I didn't know at this point whether I was dealing with a witness now or whether I was dealing with someone who may have had some involvement, and needing to determine one way or the other, I asked him, "I'm starting to get the impression that you had something to do with this, is that true?"

And at that point he sighed very heavily looked down into his lap, nodded to me in the affirmative. He looked back up and he said, "All the evidence you need is in the basement."

In response, Ziegler said, "Do you understand at this point that you are under arrest?" Defendant replied, "Yes, I know." Ziegler then handcuffed Jones to a chair and advised him of his *Miranda* [1] rights. Defendant stated, "I'd better get an attorney," and Ziegler terminated the interview.

Sergeant O'Meara and other police officers arrived at 168 Spring Street at approximately 5:15 p.m. Having been informed by Ziegler that defendant said that the evidence was in the basement, O'Meara entered the empty house and made his way to the cellar. At the bottom of the basement stairway, O'Meara saw a large puddle of blood, a blood-soaked towel and sheet and organic matter on the floor. According to O'Meara, the ceiling, walls and furniture were covered with spattered blood. O'Meara also observed a pitchfork and a pruning-type saw blade on the floor as well as a blood-covered metal baseball bat near the stairway.

O'Meara followed a trail of blood leading to another basement room where he observed a woman lying on her back on the floor, face up with a plastic garbage bag over her head. The woman was lying in a large pool of blood and her clothing was bunched up around her chest. She was naked from the upper abdomen to her ankles, socks and sneakers. Her underpants were hanging off her upper left thigh. O'Meara secured the scene and notified the prosecutor's office and the medical examiner. The medical examiner, Maryann Clayton, M.D., arrived at the scene and pronounced the victim dead. The victim was eventually identified as A.K., age twenty-one.

### Defendant's Statements

Before we discuss the circumstances regarding the issuance and execution of the search warrant, we address the potential use of certain of defendant's statements to Ziegler in the event defendant testifies at trial. In a forty-five page written opinion, the trial

---

[1] *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

court addressed a number of issues, including the admissibility of defendant's statements to O'Meara and Ziegler. The court determined that *Miranda* was not applicable to defendant's statements made to O'Meara on the street because defendant was not then in custody. The court ruled that custody began when defendant was escorted into the police headquarters, and that questions asked thereafter, constituted custodial interrogation requiring *Miranda* warnings. The court, however, relying on *People v. Modesto*, 62 *Cal.2d* 436, 42 *Cal.Rptr.* 417, 398 *P.2d* 753 (1965); *People v. Dean*, 39 *Cal.App.3d* 875, 114 *Cal.Rptr.* 555 (1974); and *People v. Willis*, 104 *Cal.App.3d* 433, 163 *Cal.Rptr.* 718, *cert. denied*, 449 *U.S.* 877, 101 *S.Ct.* 222, 66 *L.Ed.2d* 99 (1980), applied the so-called "rescue doctrine" and held that statements made in the police department relating to defendant's checking of the victim's breathing and defendant's certainty that the victim was dead were admissible despite the absence of *Miranda* warnings. The court also ruled that Ziegler's asking whether anyone else was in the house also fell within this group and was, therefore, admissible because "Ziegler was most likely attempting to learn whether or not a third party had also been injured in the course of events that led to the reported death of the victim."

Due to the *Miranda* violation, the court, in its August 5 order, ruled inadmissible defendant's statement that "all the evidence you need is in the basement" as well as defendant's affirmative nod in response to the question "I'm starting to get the impression you are involved in this, is this true?" The court determined that defendant's statement, "Tell them that the front door is open and that the body is in the basement," was admissible because it was a volunteered statement and not the result of an interrogation.

The State did not seek leave to appeal from the trial court's determinations regarding the applicability of *Miranda* to certain of the questions posed to defendant in the police station. The State does challenge, and we granted leave to appeal from, the court's determination that defendant's affirmative nod to Ziegler's question as to whether defendant was involved and defendant's

statement that "all the evidence you need is in the basement" were involuntary and, therefore, may not be used by the State for impeachment purposes at trial if defendant testifies. The court's determination in this regard was not made in its written opinion but rather in an oral opinion on July 22, 1997, after it had filed its written opinion. It appears from its oral opinion that the court deemed the nod and final statement as involuntary because it was satisfied that "it dawned on Officer Ziegler in advance in that he was now interrogating him for evidence to use against him."

On August 5, 1997, the trial court orally supplemented its rationale, stating:

> I thought that he [Ziegler] had intimidated this witness somewhat. I found that he was not candid. It was somewhat self-serving. I clearly said it was not a voluntary and freely given statement by virtue of those statements. He was in custody, I said. I also found that the statements were not voluntary and not only because he was in custody but because he [Ziegler] kept asking him additional questions, the detective, and I did not find the rationale he used was sufficient for the rescue.... That's why, because it was a searching question, he was probing, it was only going—he was looking for additional information to inculpate the defendant. So it was not freely and voluntarily given.

A statement by a defendant taken without *Miranda* warnings or in violation of the Fifth Amendment, nevertheless, may be used to impeach defendant's testimony at trial. *See Oregon v. Hass,* 420 *U.S.* 714, 723, 95 *S.Ct.* 1215, 1223, 43 *L.Ed.*2d 570, 578 (1975) (holding that defendant's statement, made after he had invoked right to counsel, was admissible to impeach defendant's testimony at trial, though not admissible on State's direct case); *Harris v. New York,* 401 *U.S.* 222, 226, 91 *S.Ct.* 643, 646, 28 *L.Ed.*2d 1, 5 (1971) (ruling that statement made without *Miranda* warning was admissible to impeach defendant's trial testimony); *State v. Burris,* 145 *N.J.* 509, 529, 679 *A.*2d 121 (1996) (holding that defendant's statement given after violations of his Fifth Amendment rights and New Jersey's right against self-incrimination was admissible for impeachment purposes).

To be admissible for impeachment purposes, however, the statement must be trustworthy. *Burris, supra,* 145 *N.J.* at 534, 679 *A.*2d 121. "Trustworthiness entails an examination of the

voluntariness of the statement. Voluntariness, in turn, depends on whether the suspect's will was overborne and whether the confession was the product of a rational intellect and a free will." *Ibid.* "The State must prove the voluntariness of a confession beyond a reasonable doubt." *State v. Galloway,* 133 *N.J.* 631, 654, 628 *A.*2d 735 (1993).

Although the trial court's rationale is not entirely clear, the court apparently based its determination that defendant's last two statements were involuntary primarily on its finding that Ziegler had violated *Miranda* and had asked "probing" questions seeking to inculpate defendant. That, of course, is not the test. The test is whether a defendant's statement is

> the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.
>
> [*Schneckloth v. Bustamonte,* 412 *U.S.* 218, 225–26, 93 *S.Ct.* 2041, 2047, 36 *L.Ed.*2d 854, 862 (1973) (citation omitted) ].

Relevant factors in determining voluntariness are the length of defendant's detention, the characteristics of the interrogation, whether defendant was advised of his constitutional rights, defendant's age and intelligence, and whether defendant endured physical punishment or mental exhaustion. *Id.* at 226, 93 S.Ct. at 2047; *see also Galloway, supra,* 133 *N.J.* at 654, 628 *A.*2d 735. Defendant did not testify at the hearings below and the testimony of O'Meara and Ziegler was uncontradicted. *Cf. Miller v. Fenton,* 474 *U.S.* 104, 110, 106 *S.Ct.* 445, 449, 88 *L.Ed.*2d 405, 411 (1985) (holding that the issue of "voluntariness" of a confession "is a legal question requiring independent federal determination."); *State v. Contursi,* 44 *N.J.* 422, 428, 209 *A.*2d 829 (1965) (where facts are established the determination of probable cause involves only the application of law).

Applying these principles, it has been held that a one-hour interrogation during which the police used psychological tactics, implied promises of mental health treatment, and deception, did not render a murder confession involuntary. *Miller v. Fenton,*

796 *F.*2d 598, 612–13 (3rd Cir.1986). *State v. Galloway, supra,*
involved the death of a three-month old child from child abuse.
After several hours of interrogation at the police station by two
detectives, defendant repudiated his first exculpatory statement
and gave an inculpatory statement. Defendant's confession re-
sulted, in part, from a detective's statement that the doctors had
to know how the baby had been injured to treat him. The Court
characterized this tactic "as a deliberate act of deception to secure
a confession." 133 *N.J.* at 653, 628 *A.*2d 735. In upholding the
voluntariness of the confession, the Court stated that "use of a
psychologically-oriented technique during questioning is not inher-
ently coercive," *id.* at 654, 628 *A.*2d 735, and observed that "[c]ases
holding that police conduct had overborne the will of the defen-
dant have typically required a showing of very substantial psycho-
logical pressure on the defendant." *Id.* at 656, 628 *A.*2d 735
(citations omitted). *See also Burris, supra,* 145 *N.J.* at 536–39,
679 *A.*2d 121 (holding that statement made during six-hour inter-
rogation not the product of overborne will); *State v. Bey,* 112 *N.J.*
123, 134–35, 548 *A.*2d 887 (1988) (ruling that confession made as
the result of three hours of interrogation during nine hours of
custody was not involuntary).

In the present case, we begin with the fact that defendant
approached the police, who at the time were unaware of the
murder. Defendant volunteered information to O'Meara regard-
ing the crime, including the information that he was "the bad
guy." All the statements defendant made to O'Meara and Ziegler
were made within ten minutes of defendant's approaching
O'Meara. Defendant was not handcuffed or physically restrained
in any way. There was no evidence that the police used physical
or mental abuse, or engaged in a well-planned, well-orchestrated
interrogation. To the contrary, the police were caught by surprise
and were obviously improvising in an attempt to determine wheth-
er a crime had been committed, the nature of the crime, the
identity of the victim, whether there were other victims or persons
at risk, and defendant's role and the source of his knowledge.

With the exception of the absence of *Miranda* warnings, found by the trial court to have been required, the record indicates that the police behaved impeccably. As soon as Ziegler had probable cause to believe that defendant was criminally involved, Ziegler advised defendant of his *Miranda* rights and honored defendant's request for a lawyer by concluding the interview.

In *Galloway, supra,* the Court, in analyzing the voluntariness issue, stated that "[t]he real issue is whether the person's decision to confess results from a change of mind rather than from an overbearing of the suspect's will." 133 *N.J.* at 655, 628 *A.*2d 735. In the present case, Jones approached the police to report the crime and to confess his guilt. There is no evidence in the record to support the trial court's conclusion regarding voluntariness. Accordingly, the court's ruling that defendant's statements were involuntary is reversed.

### The Search Warrant

On July 20, 1995, at 1:00 a.m., approximately eight hours after the police found A.K.'s body, Senior Investigator Frank Kelleher of the Bergen County Prosecutor's Office filed a written application for a warrant to search defendant's home at 168 Spring Street. The application recited the conversations among defendant, Sergeant O'Meara and Detective Ziegler, with the exception of defendant's statement that the victim was his friend, and described finding the victim's body in the basement. The application then provided the issuing judge with the following information:

> The partially nude body of the white female was lying face up, in the western room of the basement, near the boiler. The head was covered with a grey, plastic garbage bag. The victim had on a dark blue T-shirt and a light blue colored shirt, which was pushed up just beneath the breast area. The victim was nude from the waist down, a ripped pair of pink underwear was draped around her left thigh, exposing her vaginal area, indicating that she also may have been a victim of an aggravated sexual assault. The victim was wearing blue socks and white sneakers.
>
> Dr. Clayton pronounced the victim dead at approximately 7:02 p.m., on July 19, 1995. Preliminary observations of the victim indicated numerous puncture wounds

to the head, neck and facial areas, and blunt force trauma to the front of the skull of the victim.

I observed laying next to the victim on the floor a plastic, clip-on photo identification tag for Chilton Memorial Hospital. I looked at this photo identification tag to see if the victim's name was on it, and found it to contain, in type, the following: [A.K.], R.N. The photo contained on the identification tag resembled the victim. Patrolman Desimone, Dr. Clayton and I then proceeded to exit the basement area. As we reached the foot of the stairs, I observed a white canvas bag with a set of car keys lying on top of it. I viewed the keys closely and observed a car key, silver and black, with the name Subaru on the key. We then exited the residence.

Upon exiting the residence, I observed a green Subaru parked facing north on the west side of Spring Street, in the vicinity between 168 Spring Street and the next residence located north of 168 Spring Street. I observed the registration of this vehicle to be N.J. Reg. CT677G. I then ran a Division of Motor Vehicles check on this registration and found that the vehicle was registered to [C.K.], [address]. I then ran a Division of Motor Vehicles check on the name [C.K.] and found a [C.K.] possessing a valid New Jersey driver's license for the above address, having a date of birth of 1/31/45.

I then ran a Division of Motor Vehicles check on the name [A.K.], which revealed an [A.K.] possessing a valid New Jersey driver's license for [address], having a date of birth of 8/11/73.

Superior Court Judge Jonathan Harris issued the warrant based on Kelleher's application. The warrant authorized the police to search for the following items:

Any weapons or instruments which may have been used to inflict the wounds on the victim's body. *Any paperwork, including letters, papers or other writings that may establish a motive for the crime of homicide and/or a relationship between the victim and the suspect, and any paperwork or other materials which establish identity,* photographs, fingerprints, blood, hairs, fibers, saliva and seminal fluid or other trace evidence; clothing and footwear that may contain hair, blood, fibers and any other trace evidence related to the victim, the suspect or the homicide scene; defendant's fingerprints, photographs, fingernail clippings and scrapings, blood samples, and head, body and public hair samples and genital and foot swabbings from the suspect to compare to any samples found at the crime scene and/or on or in the victim's body, as well as any other instrumentalities and paraphernalia used in connection with or in furtherance of the commission of a crime or which are evidence of the commission of a crime in violation of the Laws of the State of New Jersey, to wit: 2C:11-3, Murder; and 2C:14-2a, Aggravated Sexual Assault.

[Emphasis added.]

The police executed the search warrant and, among other things, seized from the basement and the third-floor of defendant's home five hundred fifty-four pages of handwritten and typed

writings. The writings included an unpublished "novel," essays and other miscellaneous writings. Some of them support an inference that defendant was obsessed with red-haired, Jewish women and violence towards women. The victim had red hair and was Jewish. The writings refer to murder, rape, decapitation and torture.

The motion judge first addressed the issue of probable cause. He stated that the issue "is not whether the issuing judge could, pursuant to common sense, reasonably believe that certain items *might* be found in a particular place, but, whether that judge was presented with facts supporting probable cause to believe that those items *would be* found." Applying this test, the court stated that it "cannot comfortably conclude that the affidavit . . . provided satisfactory probable cause to believe that the defendant's home harbored writings of the type described in the application."

The court also concluded that the warrant did not describe with sufficient particularity the writings which the police were authorized to search for and seize. In so concluding, the court placed particular emphasis on First Amendment considerations relying on *Stanford v. Texas*, 379 *U.S.* 476, 85 *S.Ct.* 506, 13 *L.Ed.*2d 431 (1965). Accordingly, the court suppressed all of defendant's writings. We now reverse.

■ The motion judge used an improper standard in reviewing a warrant issued by another Superior Court Judge and applied the wrong test of probable cause. In *State v. Kasabucki*, 52 *N.J.* 110, 244 *A.*2d 101 (1968), the Court reversed an order suppressing evidence seized pursuant to a search warrant. The Court discussed the concept of probable cause and described it as "a flexible, nontechnical concept." *Id.* at 116, 244 *A.*2d 101. The Court noted that probable cause "has been construed to signify less evidence than would be required to establish guilt of the crime for which the warrant is sought," and that "[i]t is a suspicion of guilt that is well-grounded; a reasonable basis for a belief that a crime has been or is being committed." *Ibid.* (citations omitted). Although *Kasabucki* was decided almost thirty years ago, the

definition of probable cause has not changed. *See State v. Novembrino,* 105 *N.J.* 95, 120, 519 *A.*2d 820 (1987); *State v. Reldan,* 100 *N.J.* 187, 196, 495 *A.*2d 76 (1985).

The United States Supreme Court discussed probable cause at length in *Illinois v. Gates,* 462 *U.S.* 213, 103 *S.Ct.* 2317, 76 *L.Ed.*2d 527 (1983). The Court described probable cause as "a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 232, 103 *S.Ct.* at 2329, 76 *L.Ed.*2d at 544. The Court noted that "[f]inely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision." *Id.* at 235, 103 *S.Ct.* at 2330, 76 *L.Ed.*2d at 546. The Court summarized the responsibility of the issuing judge:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a *fair probability* that contraband or evidence of a crime will be found in a particular place.
>
> [*Id.* at 238, 103 *S.Ct.* at 2332, 76 *L.Ed.*2d at 548 (emphasis added).]

The Court held that this determination is to be made based on the "totality of the circumstances" presented to the issuing judge. *Ibid.*

In *Kasabucki, supra,* the New Jersey Supreme Court described the process in similar terms, emphasizing the special perspective of trained and experienced law enforcement personnel. The Court stated:

> When a police officer seeking a search warrant presents the basis therefor in affidavit form to a judge for evaluation on the issue of probable cause, the judge's approach must be a practical and realistic one. The officer's statements must be looked at in a common sense way without a grudging or negative attitude. There must be an awareness that few policemen have legal training and that the material submitted to demonstrate probable cause may not be described with the technical nicety one would expect of a member of the bar. Moreover, the judge should take into account the specialized experience and work-a-day knowledge of policemen. *State v. Contursi,* 44 *N.J.* 422, 431 [209 *A.*2d 829] (1965). The facts asserted must be tested by the practical considerations of everyday life on which reasonably prudent and experienced police officers act. *Brinegar v. United States, supra,* 338 *U.S.* at p. 175, 69 *S.Ct.* [at pp. 1310–11] 1302, 93 *L. Ed.* at p. 1890.

[52 *N.J.* at 117, 244 *A.*2d 101.]

The opinions in *Kasabucki* and *Gates* also defined the limited role of a reviewing court. In *Kasabucki,* the Court required a reviewing trial court to "pay substantial deference" to the issuing judge's determination. *Ibid.* It observed that "another trial judge of equal jurisdiction should regard as binding the decision of his brothers that probable cause had been sufficiently shown to support a warrant, unless there was clearly no justification for that conclusion." *Ibid.*

To encourage police to resort to search warrants rather than warrantless searches and to submit to the superintendence of a neutral judicial officer, the Court in *Gates* confirmed the narrow role of a reviewing court:

> Similarly, we have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review. A magistrate's "determination of probable cause should be paid great deference by reviewing courts." *Spinelli [v. U.S.],* 393 *U.S.* [410,] 419, 89 *S.Ct.* 584 [590–91], 21 *L.Ed.*2d 637 [(1969)], "A grudging or negative attitude by reviewing courts toward warrants," *[U.S. v.] Ventresca,* 380 *U.S.* [102] 108, 85 *S.Ct.* 741 [745–46], 13 *L.Ed.*2d 684 [(1965)], is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; "courts should not invalidate ... warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a common-sense, manner." *Id.* at 109, 85 *S.Ct.* at 746.

> [*Gates, supra,* 462 *U.S.* at 236, 103 *S.Ct.* at 2331, 76 *L. Ed.*2d at 547.]

In the present case, the motion judge ruled that probable cause did not exist to search for papers and writings to establish a motive or a relationship between defendant and the victim. In so ruling, the motion judge determined that the facts presented in support of the warrant application had to establish a likelihood that those items *would be* found. This requirement is contrary to the United States Supreme Court's rejection of "[f]inely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence," *Gates, supra,* 462 *U.S.* at 235, 103 *S.Ct.* at 2330, 76 *L.Ed.*2d at 546, and violates the preferred standard of "fair probability." *Id.* at 238, 103 *S.Ct.* at 2332, 76 *L.Ed.*2d at 548.

Although Investigator Kelleher's affidavit did not inform Judge Harris, the issuing judge, that defendant had admitted to Officer Ziegler that the victim was his friend, Judge Harris fairly could have inferred that defendant and the victim had a social relationship. Defendant and the female victim were of similar age. The police found the victim's handbag in the basement with her car keys neatly placed on top of it. The victim's car was parked on defendant's street near defendant's home, and the crime occurred in defendant's home. These facts suggest that the victim was a visitor at defendant's home; they are inconsistent with an inference that defendant had selected A.K. at random and had compelled her to accompany him to his house.

Kelleher also presented evidence to Judge Harris that A.K. had been assaulted sexually, that blood was spattered on the "walls, ceiling and furniture ... indicating a struggle had taken place," and that the victim had sustained "numerous puncture wounds to the head, neck and facial areas, and blunt force trauma to the front of the skull of the victim."

Marshalling those facts, and taking into account the remorse which motivated defendant to approach the police, it was inferable that A.K.'s death was a crime of passion or rage suggesting a fractured personal relationship.[2] Considering the "specialized experience and work-a-day knowledge of policemen" and "the practical considerations of everyday life on which reasonably prudent and experienced police officers act," *Kasabucki, supra,* 52 *N.J.* at 117, 244 *A.*2d 101, it was a fair probability that defendant's house contained writings, by defendant or by A.K., relevant to and defining their relationship.

Additionally, we detect in the motion judge's approach the "grudging or negative attitude by reviewing courts toward war-

---

[2] Such an inference finds support in the Prevention of Domestic Violence Act of 1991, *N.J.S.A.* 2C:25-17 to -33. The Act is founded on the recognition that personal relationships all too frequently degenerate into violent encounters. In this regard we note that the Act is not limited to cohabitants. It also applies to persons in a "dating relationship." *N.J.S.A.* 2C:25-19d.

rants," criticized by the Supreme Court, *Gates, supra,* 462 *U.S.* at 236, 103 *S.Ct.* at 2331, 76 *L.Ed.*2d at 547, and a failure to give great deference to Judge Harris' determination of probable cause. In doing so, the motion judge ignored the Supreme Court's advice that the preference for police to resort to a warrant requires that "in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall." *United States v. Ventresca,* 380 *U.S.* 102, 106, 85 *S.Ct.* 741, 744, 13 *L.Ed.*2d 684, 687 (1965).

We also observe that the issue before Judge Harris was limited to whether there was probable cause to believe that defendant's home contained relevant evidence in addition to the evidence in the basement. Whether a crime had been committed was not an issue. At issue was the breadth of the warrant and not whether any warrant should have issued. We addressed a "breadth" issue in *State v. Sheehan,* 217 *N.J.Super.* 20, 524 *A.*2d 1265 (App.Div. 1987). There, a warrant to search a multiple-occupancy single family house was issued based on evidence that investigators had purchased drugs from Jeffrey Till, an occupant of the house. The drug transactions had occurred in Till's bedroom. The warrant authorized a search of the entire premises. The searchers found drugs in Till's bedroom, in a bedroom occupied by defendant James Sheehan and in the kitchen. James Sheehan's sister, Florence Sheehan, owned the house. We held that there was probable cause to search the entire house though the drug activity which supported the search had occurred only in Till's bedroom. *Id.* at 27–28, 524 *A.*2d 1265.

Similarly, in *Reldan, supra,* the Supreme Court held that the vacuuming of a car did not exceed the scope of a warrant to search it for evidence connecting defendant to multiple burglaries. The vacuuming produced human hairs linking defendant with two murders unrelated to the burglaries. The Court's analysis of the breadth of the warrant and the scope of the search is instructive:

Here, the warrant authorized the search for numerous items of personal property, as well as evidence relating to the alleged crimes. Presumably none of the items of stolen property was so minuscule as to require a vacuum to retrieve it.

On the other hand, as the State points out, the vacuum could have been effective in retrieving small particles of jewelry that may have broken off—for example, backs of earrings, clasps of necklaces, and small gems. In addition, the vacuum could appropriately have been used to uncover other evidence of the break and entries, such as soil particles, debris, paint chips and the like. The application for the search warrant recited adequate facts to demonstrate probable cause and specifically requested judicial authorization to search defendant's automobile for criminal evidence relating to the "break and entry ... including *but not limited to, fingerprints, implements used to commit the break and entries, ... and anything else of evidentiary value that a complete and thorough search might disclose.*" (Emphasis added.) Consequently, it does not appear that a search consisting of the retrieval by the use of a vacuum of debris from the floor of an automobile in connection with the execution of a search warrant directed to evidence of household burglaries exceeded the scope of the warrant either as to the areas searched or items sought.

[*Reldan, supra,* 100 *N.J.* at 196, 495 *A.*2d 76.]

In the present case, the warrant was more specific and defined with more particularity than the warrant in *Reldan* the nature of the papers and writings to be searched for and seized.

The motion judge's reliance on the First Amendment and *Stanford v. Texas, supra,* is misplaced. *Stanford* involved a warrant to search for and seize "any books, records, pamphlets, ... pictures, recordings or any written instruments showing that a person or organization is violating or has violated any provision" of the Texas Suppression Act which outlawed the Communist Party. The officers executing the warrant seized books and pamphlets comprising 300 separate titles including works by "Karl Marx, Jean Paul Sartre, Theodore Draper ... Pope John XXIII, and Mr. Justice Hugh L. Black." 379 *U.S.* at 479–80, 85 *S.Ct.* at 509, 13 *L.Ed.*2d at 434. The Court held that the warrant constituted a general warrant prohibited by the Fourth Amendment because it lacked particularity regarding the things to be seized. The Court based its conclusion on the fact that "it was not any contraband ... which was ordered to be seized, but literary material ...," *id.* at 486, 85 *S.Ct.* at 512, 13 *L.Ed.*2d at 437, noting that the "constitutional requirement that warrants must particularly describe the 'things to be seized' is to be accorded the most scrupulous exactitude when the 'things' are books, and the basis for their seizure is the ideas which they contain." *Id.* at 485, 85

*S.Ct.* at 511–12, 13 *L.Ed.*2d at 437. *See also State v. Muldowney,* 60 *N.J.* 594, 601, 292 *A.*2d 26 (1972) (observing that "[t]he danger inherent in a general warrant is magnified in cases which involve freedom of expression protected by the First Amendment.").

In the present case the motion judge purported to apply *Stanford*'s "scrupulous exactitude" test. In this respect the motion judge erred by not appreciating the difference between the seizure of writings to suppress them and the seizure of writings for use as evidence. The Supreme Court articulated that distinction in *Heller v. New York,* 413 *U.S.* 483, 492, 93 *S.Ct.* 2789, 2794–95, 37 *L.Ed.*2d 745, 754 (1973). *See also New York v. P.J. Video, Inc.,* 475 *U.S.* 868, 873–75, 106 *S.Ct.* 1610, 1614–15, 89 *L.Ed.*2d 871, 879–80 (1986). We recognized the distinction in *State v. Tunnel Citgo Servs.,* 149 *N.J.Super.* 427, 374 *A.*2d 32 (App.Div.1977), a prosecution for failure to pay motor fuel taxes. Pursuant to a warrant, the State seized defendant's business records. In an attempt to suppress the evidence, defendants relied on *Stanford v. Texas, supra.* We rejected *Stanford*'s applicability because "it concerned First Amendment rights," *Tunnel Citgo Servs., supra,* 149 *N.J.Super.* at 432, 374 *A.*2d 32, and the "test of particularity ... is much more strict when First Amendment rights are involved...." *Ibid.*

We conclude that the scrupulous exactitude test did not apply in the present case and that the warrant was as specific as the circumstance allowed.[3] *Id.* at 431, 374 *A.*2d 32. The warrant limited the searching officers' discretion because it authorized only the seizure of writings that had a tendency to establish a motive, identity and a relationship between defendant and the victim. *See Muldowney, supra,* 60 *N.J.* at 600, 292 *A.*2d 26 (noting that a warrant is sufficiently definite if the "officer executing it can identify the property sought with reasonable certainty."); *see also*

---

[3] New Jersey's analogue to the Fourth Amendment is *N.J. Const.* art. I, ¶ 7. The fact that it specifically mentions "papers," unlike the Fourth Amendment, does not change our analysis.

*Andresen v. Maryland,* 427 *U.S.* 463, 479–80, 96 *S.Ct.* 2737, 2748, 49 *L.Ed.*2d 627, 642–43 (1976) (holding that a warrant authorizing a search for evidence relevant to the crime of false pretense regarding a specified lot in a real estate development satisfied the particularity test).[4]

### Exclusion of the Deputy Medical Examiner's Supplemental Report

Dr. Clayton, the Deputy Medical Examiner, performed a post-mortem examination of the victim on July 20, 1995. The initial report is dated July 20, 1995 and consists of thirteen pages. The report describes Dr. Clayton's findings on physical examination of the victim's body, the most dramatic of which were multiple skull and facial fractures and stab wounds of the face and neck, which Dr. Clayton described as stab wounds A through P. Dr. Clayton concluded that the cause of death was "multiple blunt and sharp force injuries of head and neck," and that the manner of death was "homicide."

Subsequently, Dr. Clayton submitted a supplemental report in which she rendered opinions regarding the instruments used by the perpetrator to cause the various injuries. Dr. Clayton noted "two separate full-thickness lacerations of the back of the head which are indicative of blunt force injuries and are consistent with a cylindrical object impacting the head, such as a baseball bat." Dr. Clayton observed that the "skull is fractured and the mid-occipital dura is lacerated." In her opinion, "these injuries would not necessarily be instantaneously fatal."

---

[4] In *Andresen,* the Court also observed that " '[t]here is no special sanctity in papers, as distinguished from other forms of property, to render them immune from search and seizure....' " 427 *U.S.* at 474, 96 *S.Ct.* at 2745, 49 *L.Ed.*2d at 639 (quoting *Gouled v. United States,* 255 *U.S.* 298, 309, 41 *S.Ct.* 261, 265, 65 *L.Ed.* 647 (1921)). Although the Court recognized that a search for particular papers will require the examination of non-germane documents, the Court did not outlaw such searches despite the resulting privacy intrusion. 427 *U.S.* at 482 n. 11, 96 *S.Ct.* at 2749 n. 11, 49 *L.Ed.*2d at 643.

In her supplemental report, Dr. Clayton discussed an irregular laceration of the forehead which she opined was consistent with a minimum of three to four multiple blunt force impacts to the area. She stated that "the underlying skull is shattered and there are depressed skull fragments of the left frontal and left temporal bones, one of which is displaced posteriorly. The frontal dura is shredded and the frontal lobes of the brain are lacerated." Dr. Clayton stated that the facial bones were fractured. She concluded that these wounds are "most consistent with respective positions of the subject and assailant as follows: the subject in a supine position, struck from above by an assailant who is facing her. . . . The force required to inflict these injuries is severe in nature and despite the magnitude of the injuries sustained, the subject's death would not necessarily be instantaneous."

Dr. Clayton then discussed the sharp force injuries of the head and neck. She opined that "wounds A through G are stab wounds consistent with the pitchfork." She noted that a black fragment of metal, irregularly shaped, was recovered from the tissues around the left jugular vein. She also opined that wounds H through P were sharp force injuries "consistent with a combination of the pitchfork and saw or maybe a product of the saw exclusively." She noted that hemorrhaging in the subcontaneous tissue on the left side of the neck was "consistent with some blood pressure in the vessels at the time of the injury, therefore implying that the subject was alive at the time the sharp force injuries were inflicted."

In her concluding paragraph of the supplemental report, Dr. Clayton stated:

> Finally, in my opinion, the blunt force injuries were inflicted before the sharp force injuries. Such sequelae of the blunt force injuries include a scalp and temporalis muscle hemorrhages and subarachnoid and cortical contusion hemorrhages of the brain. These are vital reactions to injury. The sharp force injuries of the left side of the face and neck also exhibit subcutaneous hemorrhages indicative of a vital reaction. However, the abrasions and cuts of the right infraclavicular region involve the skin and right pectoralis muscle and there is no hemorrhage in the right pectoralis muscle, indicating a post-mortem injury.

■ The motion judge ruled that Dr. Clayton would not be permitted to testify regarding the opinions she expressed in her supplemental report because those opinions were not relevant to any issue in the case and their potential for prejudice exceeded any probative value those opinions might have. The motion judge expressed particular concern regarding Dr. Clayton's conclusion that A.K. was still alive when the perpetrator inflicted the saw wounds. He reasoned that such an opinion would be relevant only if the State were relying on aggravating factor 4(c) in seeking the death penalty, *N.J.S.A.* 2C:11–3c(4)(c), *i.e.*, that the "murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated assault to the victim." *Ibid.* The State had not identified 4(c) as an aggravating factor, relying instead on aggravating factors 4(f) and (g). They provide:

(f) The murder was committed for the purpose of escaping detection, apprehension, trial, punishment or confinement for another offense committed by the defendant or another;

(g) The offense was committed while the defendant was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit murder, robbery, sexual assault, arson, burglary or kidnapping.

[*N.J.S.A.* 2C:11–3(c)(4)(f) and (g).]

We now reverse. As the State points out, medical opinions regarding the implements causing death, distinguishing between wounds as the cause of death, the sequence of wounds infliction, and the body position of victim and perpetrator are commonly admitted. *See State v. Chew,* 150 *N.J.* 30, 87–88, 695 *A.2d* 1301 (1997) (medical examiner testifies that crisscross scratches on face of victim "were made while [the victim] was 'either restrained or certainly not moving ... [and] were deliberate.'"); *State v. Marshall,* 123 *N.J.* 1, 34, 586 *A.2d* 85 (1991) *cert. denied,* 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.2d* 694 (1993) (based on nature and position of bullet wounds, pathologist opines that victim was lying down with her left arm under her body); *State v. Hightower,* 120 *N.J.* 378, 388–89, 577 *A.2d* 99 (1990) (medical examiner offers opinion as to sequence of shots based on wounds sustained by victim); *State v. Russo,* 243 *N.J.Super.* 383, 406, 579 *A.2d* 834

(App.Div.1990), *certif. denied,* 126 *N.J.* 322, 598 *A.*2d 882 (1991) (medical examiner opines that victim moved between the first and second time he was shot and that he was on his knees and leaning somewhat forward between the two shots).

We do not, however, rest our reversal of the motion judge's order solely on general grounds of historic admissibility. The State has the burden of proving all the elements of capital murder beyond a reasonable doubt. *N.J.S.A.* 2C:1–13a; *N.J.S.A.* 2C:2–2a and b(1) and (2). The State must carry its burden on its direct case or suffer a judgment of acquittal. If a defendant remains silent and presents no evidence, the State will not have an opportunity during cross-examination or on rebuttal to supplement its evidence.

In the present case the State must prove that defendant "did by his own conduct, purposely or knowingly cause the death or serious bodily injury resulting in the death of [A.K.]" as charged in the First Count of the indictment, the capital murder count. The indictment also charges defendant with two counts of non-capital felony murder, in violation of *N.J.S.A.* 2C:11–3a(3), based on allegations that defendant caused A.K.'s death in connection with the crime of sexual assault, Second Count, and aggravated sexual assault, Third Count. The Fourth Count charges aggravated sexual assault "through the use of physical force or coercion, the victim sustaining severe personal injury" contrary to *N.J.S.A.* 2C:14–2a(6). The Fifth Count charges defendant with possession of certain weapons, an aluminum bat, pitchfork and a saw, with purpose to use them unlawfully against the person of another.

At trial the jury will hear testimony and see evidence tending to establish that three implements may have been involved in A.K.'s death: a bat, a pitchfork and a saw. The autopsy also established two types of injury: blunt force trauma to the head and sharp force injuries to the head and neck. Dr. Clayton's supplemental report allocates these injuries to each of the three implements. Only the saw contained a fingerprint identified as defendant's. Thus, Dr. Clayton's opinions that the skull fracture and resulting

brain injury "would not necessarily" cause instantaneous death and that the victim was alive when the saw injuries were inflicted are highly probative. If credited by the jury, those opinions support a finding that the saw, which direct evidence placed in defendant's hand, contributed to A.K.'s death. Such a finding is important to the State's capital case because the State must establish that defendant "committed the homicidal act by his own conduct." *N.J.S.A.* 2C:11–3c.

Dr. Clayton's opinion that the weapons were used serially, that the bat was used first, that A.K. was still alive after the bat attack, and that sharp force injuries were then inflicted, is also probative regarding the actor's intent, *i.e.,* whether it was a purposeful or knowing killing. Moreover, in the event defendant requests and is entitled to a jury instruction regarding lesser included offenses such as aggravated manslaughter, *N.J.S.A.* 2C:11–4a, and reckless manslaughter, *N.J.S.A.* 2C:11–4b(1), Dr. Clayton's opinion regarding the injury and weapon sequence "has substantial probative value ... in establishing that defendant acted with the necessary culpability, *i.e.,* 'extreme indifference to human life,' that distinguishes aggravated manslaughter from reckless manslaughter." *State v. Crumb,* 277 *N.J.Super.* 311, 318, 649 *A.2d* 879 (App.Div. 1994). Additionally, evidence that each of the three implements inflicted wounds is probative regarding the Fifth Count charging possession of each implement with a purpose to use them unlawfully. *N.J.S.A.* 2C:39–4d.

Dr. Clayton's opinion that A.K. was struck by the bat from above while she was in a supine position also suggests a purposeful or knowing killing, and would blunt any suggestion that the victim was an aggressor.

The order precluding use of Dr. Clayton's supplemental report also provided "there shall be separate guilt and penalty phase juries empaneled in this matter" if this court reverses the order precluding the supplemental report. We now reverse that element of the order.

The capital murder statute provides that the sentencing proceeding

> shall be conducted by the judge who presided at the trial and before the jury which determined the defendant's guilt, except that, for good cause, the court may discharge that jury and conduct the proceeding before a jury empaneled for the purpose of the proceeding.

> [*N.J.S.A.* 2C:11–3c(1).]

In *State v. Ramseur*, 106 *N.J.* 123, 524 *A.*2d 188 (1987), the Court, in ruling that the "death qualification" of jurors in a capital case was constitutional, discussed the good cause exception to the single-jury scheme. The Court stated:

> We cannot agree with the concurring opinion's suggestion that avoidance of a jury prone to convict in the guilt phase may constitute "good cause" for empanelling a new sentencing jury within the meaning of Section c(1). Such an interpretation would mean that "good cause" for empanelling a new jury would exist in most if not practically all death penalty cases. The language of the statute and its legislative history clearly demonstrate, however, that the Legislature intended the "good cause" provision to be reserved for the exceptional, not the ordinary, case. See Capital Punishment Act: Hearings on S.112 Before the *N.J.* Senate Judiciary Comm., 200th Leg., 2nd Sess. (1982). Nor are we free, as the concurring opinion suggests, to require post-guilt death qualification pursuant to our common-law supervisory powers over the administration of criminal justice. The Legislature has spoken in this area, explicitly requiring that generally the same jury must decide both guilt and sentencing. Absent a constitutional basis, this Court is not empowered to override the Legislature's determination.

> [*Id.* at 252 n. 56, 524 *A.*2d 188.]

In *State v. Biegenwald*, 126 *N.J.* 1, 594 *A.*2d 172 (1991), the Court identified a category of cases which are an exception to the rule. Aggravating factor (4)(a) is that "the defendant has been convicted at any time, of another murder." *N.J.S.A.* 2C:11–3 c(4)(a). The Court ruled that if the State relies on this factor a defendant must be permitted to question potential jurors about the impact of the prior murder on their ability to be fair and impartial. *Biegenwald, supra,* 126 *N.J.* at 42–43, 594 *A.*2d 172. The Court held that

> our finding that defendant is entitled to *voir dire* potential jurors on the possible blinding impact of the c(4)(a) factor most likely will require a two-jury system for all capital cases in which the State seeks to prove that factor. That is because aggravating factor c(4)(a), unlike all other aggravating factors, is proved by evidence not generally admissible during the [guilt phase of the trial.]

[*Id.* at 43–44, 594 *A.*2d 172.]

*See also State v. Moore,* 113 *N.J.* 239, 277, 550 *A.*2d 117 (1988) (stating that trial court may have to empanel new jury for penalty phase if court believes that limiting instructions would be insufficient to protect defendant from the impact of other crimes evidence introduced during guilt phase).

 In the present case, we have concluded that Dr. Clayton's testimony regarding the supplemental report should not have been ruled inadmissible during the guilt phase. That evidence does not present the problem addressed in *Biegenwald, i.e.,* evidence admissible only in the penalty phase prejudicing defendant in the guilt phase. We are persuaded, therefore, that this record does not present the exceptional case warranting a deviation from the Legislature's preference for a single jury. Moreover, even if the evidence poses a risk of undue prejudice in the penalty phase, thereby justifying a second jury for the penalty phase, making that decision before completion of the guilt phase is premature.

### Search of Law Enforcement Personnel Files

The last issue involves the order compelling the "prosecutor to examine the personnel files of its law enforcement witnesses for material relevant to credibility and to disclose information relevant to credibility to the defense." We now reverse.

 The United States Supreme Court has held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment...." *Brady v. Maryland,* 373 *U.S.* 83, 87, 83 *S.Ct.* 1194, 1196–97, 10 *L.Ed.*2d 215, 218 (1963); *see also State v. Carter,* 91 *N.J.* 86, 110–11, 449 *A.*2d 1280 (1982) (applying *Brady* ). Thus, *Brady* requires "disclosure only of evidence that is both favorable to the accused and 'material either to guilt or to punishment.'" *United States v. Bagley,* 473 *U.S.* 667, 675, 105 *S.Ct.* 3375, 3379, 87 *L.Ed.*2d 481, 489 (quoting *Brady, supra,* 373 *U.S.* at 87, 83 *S.Ct.* at 1196, 10 *L.Ed.*2d at 218). Impeachment evidence, as well as exculpatory evidence, falls

within the *Brady* rule. *Bagley, supra,* 473 *U.S.* at 676, 105 *S.Ct.* at 3380, 87 *L.Ed.*2d at 490; *Carter, supra,* 91 *N.J.* at 111, 449 *A.*2d 1280.

A prosecutor has a duty to learn of "any favorable evidence known to others acting on the government's behalf in the case, including the police." *Kyles v. Whitley,* 514 *U.S.* 419, 437, 115 *S.Ct.* 1555, 1567, 131 *L.Ed.*2d 490, 508 (1995). This includes information known to other members of the prosecutor's office or other agencies cooperating in the criminal investigation. *See e.g., State v. Landano,* 271 *N.J.Super.* 1, 31, 41–42, 637 *A.*2d 1270 (App.Div.) (discussing state's failure to disclose police officer's handwritten notes that might have exculpated defendant), *certif. denied,* 137 *N.J.* 164, 644 *A.*2d 612 (1994); *State v. Engel,* 249 *N.J.Super.* 336, 396, 592 *A.*2d 572 (App.Div.) (indicating that the knowledge of one member of the prosecutor's office is to be imputed to another in a *Brady* context), *certif. denied,* 130 *N.J.* 393, 614 *A.*2d 616 (1991).

The extent of a prosecutor's duty to learn of evidence favorable to the accused varies among the federal circuit courts. The State points out that the Third, Sixth, and Seventh Circuits have ruled that a defendant's request for discovery of materials from files outside the prosecutor's file, such as the personnel records of police officers, cannot be based on mere speculation that a government file might contain *Brady* material. *See, e.g., United States v. Driscoll,* 970 *F.*2d 1472, 1482 (6th Cir.1992), *cert. denied,* 506 *U.S.* 1083, 113 *S.Ct.* 1056, 122 *L.Ed.*2d 362 (1993) (holding that a mere speculative claim by defendant was not sufficient); *United States v. Andrus,* 775 *F.*2d 825, 843 (7th Cir.1985) (holding that defendant was not entitled to personnel files "without even a hint" that impeaching material was contained within them, and noting that "[a] due process standard which is satisfied by mere speculation would convert *Brady* into a discovery device and impose an undue burden upon the ... court"); *United States v. Navarro,* 737 *F.*2d 625, 630–31 (7th Cir.), *cert. denied,* 469 *U.S.* 1020, 105 *S.Ct.* 438, 83 *L.Ed.*2d 364 (1984) (holding that "[m]ere speculation that a gov-

ernment file may contain *Brady* material is not sufficient to require" in camera inspection).

The Third Circuit, in *United States v. Joseph,* 996 *F.*2d 36, 41 (3d Cir.), *cert. denied,* 510 *U.S.* 937, 114 *S.Ct.* 357, 126 *L.Ed.*2d 321 (1993), noted that reading *Brady* to require prosecutors to search collateral files on a defendant's general request

> would place an unreasonable burden on prosecutors for it is one thing to require honest searches, reasonable in scope, of unrelated files for specific identifiable information, but quite another thing to send prosecutors on open-ended fishing expeditions.

> *[Ibid.]*

In the present case, the motion judge substantially based his ruling on the Ninth Circuit's holding in *United States v. Cadet,* 727 *F.*2d 1453 (9th Cir.1984). In *Cadet,* the Ninth Circuit stated:

> In response to a request for exculpatory evidence the prosecution does not have a constitutional duty to disclose every bit of information that might affect the jury's decision; it need only disclose information favorable to the defense that meets the appropriate standard of materiality. If the prosecution is uncertain about the materiality of information within its possession, it may submit the information to the trial court for an *in camera* inspection and evaluation.

> *[Id.* at 1467–68 (citations omitted) (quoting *United States v. Gardner,* 611 *F.*2d 770, 774–75 (9th Cir.1980)).]

The issue of defendant's access to police personnel records was addressed in *State v. Kaszubinski,* 177 *N.J.Super.* 136, 425 *A.*2d 711 (Law Div.1980). In *Kaszubinski,* defendant was indicted for assaulting a police officer with a dangerous weapon. *Id.* at 138, 425 *A.*2d 711. Defendant argued that he should be entitled to inspect the officer's personnel file for instances that might affect the trustworthiness and credibility of his testimony. *Id.* The court noted:

> There is obviously a significant public interest in maintaining the confidentiality of police personnel records. They are essential to the development of complete and accurate information on members of the police department. Proper supervision of the department demands a thorough investigation of a police officer's background before his appointment and accurate records relating to his performance after his appointment. Persons charged with the responsibility of conducting the affairs of the police department must be able to rely on confidential information prepared for internal use. The integrity of this information would be eroded if public exposure were threatened.

[*Id.* at 138–39, 425 *A.*2d 711.]

The court recognized, however, that the confidentiality of these records is not absolute, but that it was appropriate to require at least some showing to justify a breach of confidentiality, or otherwise the court would be required to inspect every witness personnel file in virtually every criminal case. *Id.* at 139–40, 425 *A.*2d 711. *See also State v. Parker,* 886 *S.W.*2d 908, 917 (Mo. 1994), *cert. denied,* 514 *U.S.* 1098, 115 *S.Ct.* 1827, 131 *L.Ed.*2d 748 (1995) (noting that the mere possibility that personnel files of police witnesses might include helpful information, unsupported by any facts, is insufficient to justify an *in camera* review of personnel files); *Cargill v. State,* 255 *Ga.* 616, 340 *S.E.*2d 891, 911 (1986), *cert. denied,* 479 *U.S.* 1101, 107 *S.Ct.* 1328, 94 *L.Ed.*2d 180 (1987) (holding that because defense counsel could not articulate a basis for a belief that police would give perjured testimony, the trial court in a capital case did not err in denying defendant's motion to discover the personnel records of police officers who would testify); *State v. Butts,* 640 *S.W.*2d 37, 39 (Tenn.Crim.App.1982) (stating that "upon a strong showing" that police personnel records might contain information material to a defendant's case, the trial court should conduct an *in camera* review and release to defendant the items the court deems material).

The confidentiality of the personnel records of governmental employees is also protected in New Jersey by Executive Order No. 11 (Nov. 15, 1974). The Order provides in pertinent part:

Except as otherwise provided by law or when essential to the performance of official duties or when authorized by a person in interest, an instrumentality of government shall not disclose to anyone other than a person duly authorized by this State or the United States to inspect such information in connection with his official duties, personnel or pension records of an individual, except that the following shall be public:

a. An individuals name, title, position, salary, payroll record, length of service in the instrumentality of government and in the government, date of separation from government service and the reason therefor; and the amount and type of pension he is receiving;

b. Data contained in information which disclose conformity with specific experimental, educational or medical qualifications required for government employment

or for receipt of a public pension, but in no event shall detailed medical or psychological information be released.

■ In the present case, the motion judge, in ruling on the same issue, stated:

the Prosecutor [must] undertake a review of the personnel files of potential law enforcement witnesses for indication of racial bias and, if presented with obviously problematic information, or information, the materiality of which the Prosecutor is uncertain about, that the State turn the applicable files over to this Court for its own "in camera" inspection of the same.

With one possible exception, nothing in the record justified the omnibus discovery order in this case. Nothing in the record would support a threshold determination that the prosecution of Jones implicates issues of racial bias within the investigating agencies. The law enforcement agencies did not target defendant because of his race. Defendant became a suspect because he reported the crime to the police, admitting his involvement, and because the victim, his female friend, was found murdered in his house.

The only exception to our reversal of the order is with regard to Lieutenant Carlino of the prosecutor's office. It appears that Carlino purchased from the lessor, vehicles previously leased by the county for the use of the prosecutor's office. This occurred in 1994. Although a criminal complaint may have been filed against Carlino, it was dismissed. Carlino received an administrative penalty. We are having difficulty determining on this record any nexus between the Carlino incident and this prosecution; nevertheless, the trial court may revisit the issue of discovery regarding Carlino's personnel file. The order is reversed.

We make one additional comment regarding defendant's writings. The State notes that, during the course of oral argument on August 5, 1996, the court made the following statement pertaining to defendant's writings:

[I]f the state is successful in this case in overturning my ruling in regard to [suppression] . . . of the written evidence at this point in time, it would be found to be inflammatory, these writings. I find that on the basis of not only an overly

broad search warrant, but pursuant to 403 is unduly inflammatory at this point.
. . . .

The court also noted at oral argument that

I'm also satisfied and I find that if the writings were admitted and that's an issue that we're skirting around, if the writings were admitted, the five hundred and fifty four pages, I would be required to have two separate juries at this point in time. I find that I would have precluded the writings in any event by 403 because it's unduly prejudicial because of the scope of that and it was not developed initially. But I would have to have two separate juries because it would not be able to get past the taint of that—some of these papers being written when [defendant] . . . was in school, long before this incident occurred.

The court, however, later stated it never directly addressed or ruled on the probative value of the writings or their capacity to generate undue prejudice, and scheduled a September 3, 1997 hearing to address those issues. Our grant of leave to appeal interdicted the scheduled hearing. We decline the State's invitation to order a limited remand during the pendency of this appeal for a ruling on the admissibility of the defendant's writings or, in the alternative, that this court retain jurisdiction of this matter pending the trial court's decision on this issue.

In light of our reversal of the order suppressing the writings on search and seizure grounds, however, the trial court will have to address the admissibility of defendant's writings in terms of relevance, probative value and unfair prejudice. It is unlikely that all of the writings are admissible. Those writings which have a clear nexus with the homicide and which tend to bring into sharp focus issues such as motive and state of mind, as in *Crumb, supra,* 277 *N.J.Super.* at 316–20, 649 *A.*2d 879, may be prime candidates for admission into evidence with appropriate limiting instructions. In the event the trial court addresses these issues in a pre-trial proceeding, the trial court must be sensitive to the need to revisit its pre-trial rulings in light of the developing record at trial. *Id.* at 321, 649 *A.*2d 879.

The orders appealed from are reversed and the case is remanded for further proceedings.