956 A.2d 375 (2008)
403 N.J. Super. 39
STATE of New Jersey, Plaintiff-Appellant,
v.
Jayson S. WILLIAMS, Defendant-Respondent.
Docket No. A-2524-07T4
Superior Court of New Jersey, Appellate Division.
Argued May 14, 2008.
Decided September 30, 2008.
*376 Bennett A. Barlyn, Assistant Prosecutor, argued the cause for appellant (J. Patrick Barnes, Hunterdon County Prosecutor, attorney; Mr. Barlyn, of counsel and on the brief).
Joseph A. Hayden, Jr., Roseland, argued the cause for respondent (Walder, Hayden & Brogan, and William R. Martin, Washington, DC (Sutherland, Asbill & Brennan) of the Washington, D.C. bar, admitted pro hac vice, attorneys; Mr. Hayden and Mr. Martin, of counsel; Christopher D. Adams and Leigh-Anne Mulrey, Roseland, on the brief).
Before Judges WEFING, PARKER, and KESTIN.
The opinion of the court was delivered by PARKER, J.A.D.
On leave granted, the State appeals from two orders entered on December 14, 2007. One order required the State to produce certain information for in camera inspection and then to produce certain information to defendant. The second order required that two items identified in the sealed record be disclosed to defendant *377 and that the remaining information in the sealed record need not be disclosed.
We briefly summarize the history of this matter to give context for our discussion of the issues raised on appeal. The charges against defendant, Jayson Williams, arose on February 13, 2002 when he hired a limousine to drive him and some friends to a Harlem Globetrotters game. State v. Williams, 190 N.J. 114, 118, 919 A.2d 90 (2007). After the game, defendant invited a number of the Globetrotters out for dinner with him and his friends. Ibid. The group left the restaurant at about 1 a.m. and were driven to defendant's home. Id. at 19, 919 A.2d 90. The limousine driver, Costas "Gus" Christofi, joined the group in defendant's home after they arrived. Ibid. At some point, defendant removed a shotgun from a cabinet in his bedroom and "wielded" it in Christofi's direction. The gun went off and Christofi was shot in the chest and killed. Ibid.
Five of the witnesses to the shooting testified at trial that defendant attempted to conceal his involvement in Christofi's death by cleaning the fingerprints off the gun and placing it in Christofi's hands. Id. at 119-20, 919 A.2d 90. Defendant removed his blood-stained clothing and told his friends, "to lie to the police by reporting that Christofi committed suicide." Id. at 120, 919 A.2d 90.
Ultimately, defendant was charged with aggravated and reckless manslaughter, N.J.S.A. 2C:11-4(a)(1) and (b)(1); possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); aggravated assault, N.J.S.A. 2C:12-1(b)(4); hindering apprehension, N.J.S.A. 2C:29-3(b); tampering with a witness, N.J.S.A. 2C:28-5(a); tampering with evidence, N.J.S.A. 2C:28-6(1); and fabricating physical evidence, N.J.S.A. 2C:28-6(2). Williams, supra, 190 N.J. at 117, 919 A.2d 90. In 2004, defendant was tried and found guilty on all counts related to his post-shooting conduct-tampering with a witness, tampering with evidence, fabricating evidence and hindering apprehension. Ibid. The jury acquitted defendant of aggravated manslaughter, possession of a weapon for an unlawful purpose and aggravated assault. The jury could not, however, reach a verdict on the reckless manslaughter charge and a mistrial was declared on that count.
In 2007, when the State announced its intention to retry defendant on the reckless manslaughter charge, defendant moved to "exclude evidence of his conduct immediately after the shooting," arguing that "his post-shooting conduct is irrelevant to whether he acted recklessly at the time of the shooting, and that the evidence is unduly prejudicial." Id. at 117, 919 A.2d 90. The trial court granted defendant's motion. We granted the State's motion for leave to appeal and affirmed in an unreported decision. The Supreme Court reversed, holding "that the consciousness of guilt evidence is relevant to defendant's mental state at the time of the shooting for which he is charged with reckless manslaughter." Id. at 118, 134, 919 A.2d 90.
On October 18, 2007, the Hunterdon County Prosecutor advised the trial court that "[p]rior to the commencement of defendant's trial [in 2004], allegations of improper conduct were made against a superior officer by another employee of the prosecutor's office. One allegation in particular concerned that officer's use of a racial epithet to describe defendant during a meeting within the office."
Pursuant to Rule 3:13-3, defendant immediately demanded information regarding the employee and the circumstances surrounding the employee's use of the "racial epithet." The State opposed the discovery request and defendant moved to compel discovery. The matter was argued on December 13, 2007. On December 14, *378 2007, the trial court entered an order requiring the State to furnish to the court for in camera inspection:
1. Each and every document pertaining to the complaint made by an "employee of the prosecutor's office" against the "superior officer" who used "a racial epithet to describe" Mr. Williams, including but not limited to all documents contained in an investigatory or disciplinary file.
2. The complete personnel file of the "superior officer" within the Hunterdon County Prosecutor's Office who used "a racial epithet to describe" Mr. Williams, as well as all other documents pertaining to that individual's employment by the Hunterdon County Prosecutor's Office.
The order further required that the State produce directly to the defense:
1. The identity of all individuals present at the "meeting within the office" at which the "superior officer" used "a racial epithet to describe" Mr. Williams;
2. All notes and documents relating in any way to the issues discussed during the "meeting within the office" of the Hunterdon County Prosecutor at which the "superior officer" used "a racial epithet to describe" Mr. Williams.
Finally, pursuant to Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the order required the State to review the files of all officers and prosecutors involved to determine whether there was any additional material that was exculpatory or could be used to impeach the State's witnesses. The court also granted the State's motion to stay the release of the documents pending appeal.
In this appeal, the State argues:
THE TRIAL COURT'S DECISION TO FURNISH UNREDACTED AND IRRELEVANT MATERIAL TO THE DEFENSE IS UNSUPPORTED BY ALL DECISIONAL AUTHORITY.
Under the New Jersey Court Rules, a criminal defendant is entitled to broad discovery. R. 3:13-3; Pressler, Current N.J. Court Rules, comment R. 3:13-3. The scope of discovery, however, is not unlimited. State v. D.R.H., 127 N.J. 249, 256, 604 A.2d 89 (1992). "[T]he relevance standard applies to all materials." Pressler, supra, comment R. 3:13-3(c). The discovery process may not be turned into "an unfocused, haphazard search for evidence," D.R.H., supra, 127 N.J. at 256, 604 A.2d 89 (citing State v. R.W., 104 N.J. 14, 28, 514 A.2d 1287 (1986)), or the type of "fishing expeditions permitted in civil proceedings." State v. Tull, 234 N.J.Super. 486, 498, 560 A.2d 1331 (Law Div.1989). The State may be required to produce materials other than those categorically listed in the Rule. Id. at 497, 560 A.2d 1331. "[T]he fact that information sought may not be admissible at trial as evidence does not bar its discovery." Id. at 500, 560 A.2d 1331.
Material that must be produced in accordance with Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), commonly referred to as Brady material, has been defined by the Supreme Court in United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481, 494 (1985), as that which if it had been disclosed to the defense would have led to a different result in the proceedings. New Jersey adopted a similar standard in State v. Carter, 91 N.J. 86, 112, 449 A.2d 1280 (1982) (quoting United States v. Agurs, 427 U.S. 97, 104, 96 S.Ct. 2392, 2398, 49 L.Ed.2d 342, 350 (1976)). When the credibility of a State witness is at issue, due process requires that the prosecution disclose any information that would allow the defendant to impeach the credibility of the *379 witness. Giglio, supra, 405 U.S. at 153-54, 92 S.Ct. at 766, 31 L.Ed.2d at 108.
In Wood v. Bartholomew, 516 U.S. 1, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995), the United States Supreme Court considered relevance in terms of admissibility. There, the Ninth Circuit Court of Appeals reversed a district court's denial of habeas corpus review because the State failed to disclose two polygraph examinations that suggested the defendant's brother may have participated in planning a robbery that ended in a homicide. Id. at 4-6, 116 S.Ct. at 8-11, 133 L.Ed.2d at 5-7. The Supreme Court reversed the Ninth Circuit's "misapplication of our Brady jurisprudence," reasoning that since the polygraph tests were inadmissible as a matter of law in the State of Washington, they were not "evidence." Id. at 2, 5, 116 S.Ct. at 9, 133 L.Ed.2d at 6-7. The results of the polygraph test "could have had no direct effect on the outcome of trial, because respondent could have made no mention of them either during argument or while questioning witnesses." Ibid. The Ninth Circuit relied on the theory that if the defendant had been aware of the tests, he might have deposed the potential co-conspirator and extracted a confession of involvement in the crime. The Supreme Court rejected that theory, noting that the defendant's brother's confession would have had no bearing on defendant's guilt in the shooting. Ibid.
In Carter, the New Jersey Supreme Court addressed the application of Brady in a broader context. The Court noted that "the State's obligation to disclose is `not limited to evidence that affirmatively tends to establish a defendant's innocence but would include any information or material... favorable to a defendant's cause even where the evidence concerns only the credibility of a State's witness.'" 91 N.J. at 111, 449 A.2d 1280 (quoting Carter, supra, 69 N.J. at 433, 354 A.2d 627) (emphasis added). The defense had requested a report on a polygraph test and the New Jersey Supreme Court determined that the correct standard was whether "the suppressed evidence might have affected the outcome of the trial." Id. at 112, 449 A.2d 1280 (quoting Agurs, supra, 427 U.S. at 104, 96 S.Ct. at 2398, 49 L.Ed.2d at 350). The Court stated that the "`might have affected the outcome of the trial' test is not translatable into the mere possibility that the undisclosed information might have helped the defense." Id. at 113, 449 A.2d 1280. The witness defendant sought to impeach with the polygraph report had faced extensive credibility attacks at trial, and the Court determined that the introduction of some additional evidence to damage his credibility would not have affected the outcome of the trial. Id. at 117-19, 449 A.2d 1280.
In State v. Jones, 308 N.J.Super. 15, 41, 705 A.2d 373 (App.Div.1998), we reversed a trial court's order requiring "the prosecutor to examine the personnel files of its law enforcement witnesses for material relevant to credibility and to disclose information relevant to credibility to the defense" because there was nothing in the record to implicate "issues of racial bias within the investigating agencies." Ibid. We further noted that police records are protected by general policy and Executive Order No. 11. Id. at 44, 705 A.2d 373 (quoting Executive Order No. 11 (November 15, 1974)).
Unlike Jones, here we have evidence of "racial bias within the investigating agency" in the "superior officer's" making racial remarks during a briefing on the case. Nevertheless, the State argues that, since the "superior officer" will not testify at trial, the evidence related to his racial remarks cannot be admitted to attack his credibility and the investigative *380 documents at issue are not, therefore, Brady/Giglio material. The State further maintains that the "superior officer's" remarks are irrelevant and, therefore, inadmissible on any issue at trial, thus not qualifying the investigative documents as Brady material. We disagree.
While the "superior officer" may not testify, defendant is entitled to the information to conduct his own investigation into whether racial bias was systemic or merely confined to the "superior officer." Because this particular individual was a "superior officer," there is genuine concern as to whether his attitudes infected the investigatory arm of the prosecutor's office or affected the investigation or prosecution of the case.
There can be no dispute that a criminal investigation infected by racial animus would violate a defendant's due process rights. See United States v. Santiago, 46 F.3d 885, 890, (9th Cir.Cal.1995) (stating that "[s]everal circuits have recognized that a defendant's constitutional rights may be violated by a trial infected with racial prejudice."). Clearly there is no room for racial bias in any law enforcement investigation. Although the State argues that the "superior officer" will not testify, it is particularly important to know whether other members of the investigation staff shared the "superior officer's" views. This may be evidenced by the reactions or responses of others present when the comments were made and by the actions taken by the prosecutor's office after the remarks were made known. This information is subject to discovery by defendant.
In rendering its decision, the trial court rejected the State's argument, noting that "under Giglio, the State [is] required to turn over any material that could impeach the credibility of any of the State's witnesses." We agree. We also agree with the trial court's order that the State must "search its own Prosecutor's Office personnel file to investigate whether there is any further information that needs to be turned over to the defense." The trial court indicated that "if the State [is] unsure whether or not [certain material] needs to be turned over," the prosecutor should "notify the [c]ourt so that the material can be reviewed on an in camera basis."
After rendering its decision on the record, the court adjourned to chambers for an in camera discussion of the documents to be produced. The court permitted defense counsel to review the sealed documents in chambers, but not to copy or retain them. The State specifically asked whether the documents relating to certain other charges against the "superior officer" must be disclosed to defendant as well. The court responded that it should "because it puts it in context." It is there that we part from the trial court's decision.
In our in camera review of the documents at issue, we found no basis for disclosing information about charges against the "superior officer" other than those specifically relating to racial comments or any other conduct indicative of or relevant to racial bias. Charges relating to those other than racial bias would not be admissible at trial for any purpose. Jones, supra, 308 N.J.Super. at 41, 705 A.2d 373. Nor do we see that investigatory material unrelated to racial bias could lead defendant to discovery of other relevant information.
This case is somewhat unique in that we are looking back to defendant's 2004 trial at the same time we are looking forward to defendant's retrial on the remaining charge. In his brief, defendant argues that the racial remarks made by the "superior *381 officer" should have been disclosed prior to defendant's trial because
it is quite possible that it might have [led] to information that, among other things, could have been used at trial to (1) counter the State's testimony from Lt. James that the State conducted a professional and objective investigation;* and (2) explore issues relating to the integrity of the firearm or [the "superior officer's"] role in conversing with witnesses prior to trial and handling evidence during the trial itself.
* This is defendant's characterization of James' testimony. In our review of the record, we note that James testified as to the steps undertaken in the investigation.
We agree.
Discovery is "appropriate if it will lead to relevant and material information." State v. Ballard, 331 N.J.Super. 529, 538, 752 A.2d 735 (App.Div.2000). A "defendant must be afforded the opportunity through effective cross-examination to show bias on the part of adverse state witnesses." State v. Sugar, 100 N.J. 214, 230, 495 A.2d 90 (1985). It is essential, therefore, that defendant be provided with investigatory information related to the "superior officer's" racial epithet and any similar conduct, and that defendant be permitted to conduct discovery related to that conduct. Even if that "superior officer" did not testify previously and will not testify at the retrial, the investigatory material and information related thereto may bear on the credibility of the State's witnesses who testified previously and/or may testify at the retrial. In other words, if any of the testifying officers were present when the racial epithet and other racial remarks were uttered, defendant is entitled to know that and to make further inquiry as to how they reacted or responded to the "superior officer's" remarks.
Our dissenting colleague concludes that the discovery at issue here will not change the outcome and does not, therefore, fall within the Bagley/Jones standard. In our view, we cannot make that determination based upon the current record. For example, we do not know when the briefing occurred at which the offensive remarks were made or who was present. Irrespective of whether the "senior officer" testified at the first trial or will testify at the coming trial, the question here is whether his comments were accepted or tolerated by others present to the extent that those comments may have reflected attitudes of others present at the briefing who may have testified at the first trial and/or will testify at the retrial. On the other hand, if discovery discloses that the "senior officer" was reproached by others present at the briefing, defendant will likely have no ground on which a motion for a new trial could be granted. Nor will he have gained any leverage in the forthcoming trial. It is the stage of the discovery that leaves us unable to predict the outcome. Nevertheless, in our view, where blatantly racist remarks have been made by a "senior officer" during a briefing on the case, due process requires that we allow discovery of relevant information to determine whether the investigation and/or prosecution was tainted by racism such that the outcome may have been different.
Accordingly, we remand the matter to the trial court for a page-by-page, line-by-line review of all documents provided by the State for in camera review to determine which portions are relevant to the racial remarks and should be disclosed to defendant and which portions should be redacted because they are not relevant to racial remarks by the "superior officer" or any other individuals in the prosecutor's office.
*382 When the court has completed its analysis, it shall enter an appropriate protective order to secure the materials released to defense counsel, as well as any materials that may be released in future discovery. In particular, the protective order should include very substantial sanctions to truly deter intentional or even inadvertent release of the documents to the press or anyone else. The protective order must limit possession of the documents to defense counsel with an absolute prohibition against copying or distributing the documents to anyone, including defendant. Moreover, since defense counsel has acknowledged that defendant's wife has frequently released information to the press that defendant and his counsel were prohibited from releasing, the protective order should contain a specific prohibition against defendant and his counsel allowing Mrs. Williams to have any access whatsoever to the documents or discussing their contents with her. This prohibition extends to anyone with whom defendant or his counsel may have contact. The sanctions should be sufficient to dissuade defendant, his counsel, his wife or anyone else from disclosing the contents of the discovery to anyone, including the press.
We have refrained from exercising our original jurisdiction pursuant to Rule 2:10-5 because we believe it more appropriate for the trial court to create a record of its in camera page-by-page, line-by-line review of the documents so that we may have a complete record in the event of future appeals.
Consequently, while we are affirming the two orders entered on December 14, 2007, we are remanding for the trial court's in camera review of the investigatory documents to determine which sections are unrelated to the racial remarks and must, therefore, be redacted before any documents are released to defense counsel. No documents shall be released, however, until a protective order is entered in accordance with our directives herein.
Affirmed in part; remanded in part. We do not retain jurisdiction.
WEFING, P.J.A.D., concurring in part and dissenting in part.
My colleagues have concluded that the trial court erred when it directed that documents relating to charges against the superior officer not involving allegations of racial bias should be disclosed to the defense. I agree and concur with that portion of my colleagues' opinion.
I am unable to agree, however, with that portion of my colleagues' opinion which concludes that the defense is entitled to engage in discovery with respect to the superior officer having uttered a racial slur against defendant. I reach this conclusion for several reasons.
The shooting of Costas "Gus" Christofi occurred in the early morning hours of February 14, 2002. Only nine days later, on February 25, 2002, a criminal complaint was filed against defendant, charging him with criminal responsibility for the death of Christofi. Less than a week later, an amended complaint was filed when the State learned of evidence with respect to defendant's post-shooting conduct, the details of which are set forth in the opinion of the Supreme Court holding that evidence of that conduct would be admissible on defendant's trial for reckless manslaughter. State v. Williams, 190 N.J. 114, 117-18, 919 A.2d 90 (2007). It was that conduct which formed the basis for defendant's convictions for hindering apprehension, N.J.S.A. 2C:29-3b; tampering with a witness, N.J.S.A. 2C:28-5a; tampering with evidence, N.J.S.A. 2C:28-6(1); and fabricating physical evidence, N.J.S.A. 2C:28-6(2).
*383 The record before us, however, is entirely devoid of any information that the comment at issue was made at any time prior to the initial decision to file criminal charges against defendant or the decision to file the amended charges. If the comment were made subsequent to those decisions, it could not have influenced them.
My colleagues note at several points in their opinion that the superior officer will not be a witness at defendant's retrial. I do not believe that is a sufficient description of the context of the appeal before us. Not only will that officer not testify at defendant's second trial, he did not testify at defendant's first trial. There is, moreover, nothing in the record before us which rebuts the State's assertion that this superior officer had absolutely nothing to do with the investigation of this defendant. I cannot disregard the fact that the defense has not pointed us to a single report or document in connection with the investigation of this shooting which notes the presence, activity or involvement of this superior officer.
More importantly, however, I do not believe that the law cited by my colleagues supports the result they have reached. They agree that the standard to be employed in determining whether a defendant has been improperly denied discovery is that set by United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481, 494 (1985), and State v. Carter, 91 N.J. 86, 112, 449 A.2d 1280 (1982): would the material if disclosed to the defense have led to a different result in the prosecution. I am unable to conceive how disclosure of this statement, reprehensible as it might be, could rationally have led to a different result, either in the decision to initiate criminal charges against defendant or in the prosecution of them.
Several factors in this record lead me to this conclusion. I do not think it could be reasonably asserted that this defendant was charged with the shooting of Gus Christofi because he is African-American. According to the Court's opinion, including defendant, six men were in the immediate vicinity of the shooting while a seventh was in another room. Williams, supra, 190 N.J. at 119, 919 A.2d 90. Of those six men, only the victim and one other were white; the others were all African-American. Clearly, defendant was not targeted for prosecution because of his race.
Additionally, there was never a question at defendant's trial that he in fact shot Christofi. Defendant's attorneys admitted from the outset of the trial that defendant shot and killed Christofi but maintained that it was a tragic accident, not a criminal act. In such a context, when the jury was not called upon to decide who did the shooting but to assess the mental state of the admitted shooter, I am unable to conclude that defendant's trial could have had a different result if the defense had known of this statement in advance.
Further, I disagree with the conclusions that my colleagues draw from the cases they cite. They refer to State v. Jones, 308 N.J.Super. 15, 705 A.2d 373 (App.Div. 1998), in which we reversed a trial court decision directing the prosecution to "undertake a review of the personnel files of potential law enforcement witnesses for indication of racial bias...." Id. at 45, 705 A.2d 373. We noted in our opinion that "[n]othing in the record would support a threshold determination that the prosecution of Jones implicates issues of racial bias within the investigating agencies." Ibid. My colleagues, justifiably offended by the insulting statement of this officer, assert that the statement is "evidence of racial bias within the investigating agency [causing] genuine concern as to whether his attitudes infected the investigatory arm of the prosecutor's office or affected the *384 investigation or prosecution of the case." (Op. at 47-48, 956 A.2d at 379-80).
The order in Jones which we struck down dealt only with "potential law enforcement witnesses." As I have already noted, however, this officer was not a witness at the first trial, will not be a witness at the second trial, and the record is absolutely barren of any evidence of his involvement in this investigation. If the order in Jones was too broad, so too must this order be.
My colleagues cite United States v. Santiago, 46 F.3d 885 (9th Cir.), cert. denied, 515 U.S. 1162, 115 S.Ct. 2617, 132 L.Ed.2d 860 (1995), for the proposition that a criminal investigation "infected by racial animus would violate a defendant's due process rights." (Op. at 48, 956 A.2d at 380) There was, however, no issue in that case dealing with the pretrial investigation conducted by the prosecution and no contention that the investigation was racially motivated. The defendant in that case was an inmate at a federal penitentiary in California who was convicted of the murder of a fellow inmate. During the course of the defendant's trial, the prosecution introduced testimony that the defendant had asked how to obtain admission to a prison gang and was told he would have to kill someone in the prison to be accepted. Id. at 888. A witness testified that the defendant told him that he had to kill someone to become a member of a gang known as the Mexican Mafia. There was also testimony that he had discussed a "hit" with a member of the Mexican Mafia the night before the murder. Ibid.
One of the defendant's contentions on appeal was that the government, by "injecting the issue of ethnicity into the trial," violated his right to equal protection. Id. at 890. The court stated that "a defendant's constitutional rights may be violated by a trial infected with racial prejudice," ibid., but rejected the defendant's argument in the appeal before it, noting that the prosecution had "simply used the name of the gang at issue ... [and] did not suggest any innuendo based on ethnic characteristics...." Id. at 891. In my judgment, nothing within Santiago provides any support for the order entered by the trial court in this matter.
My colleagues also refer to Wood v. Bartholomew, 516 U.S. 1, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995). The defendant in that case, Dwayne Bartholomew, was charged with the killing of a laundromat attendant during the course of a robbery. Similar to this appeal, the defendant admitted the robbery and the shooting, but contended that the gun discharged accidentally. Id. at 2-3, 116 S.Ct. at 8, 133 L.Ed.2d at 5. The defendant was convicted; he was originally sentenced to death. When that sentence was overturned on appeal, he was resentenced to life in prison, without parole. Id. at 4, 116 S.Ct. at 9, 133 L.Ed.2d at 5.
There, the defendant's brother, Rodney Bartholomew, and Rodney's girlfriend both testified at the defendant's trial. They had been at the laundromat when the defendant arrived. Rodney testified that the defendant told him he intended to commit the robbery and to "leave no witnesses." Rodney's girlfriend testified she heard the defendant make this statement and that he later told her he "had put two bullets in the kid's head." Id. at 3, 116 S.Ct. at 9, 133 L.Ed.2d at 5.
Both Rodney and his girlfriend underwent polygraph examinations by the prosecution before the defendant's trial. Id. at 4, 116 S.Ct. at 9, 133 L.Ed.2d at 6. The examiner asked Rodney during the course of the examination whether he had been in the laundromat with his brother and whether he had assisted his brother with the robbery. Rodney said no to both *385 questions and the examiner concluded that these answers indicated deception. Ibid. The examiner asked Rodney's girlfriend whether she had helped the defendant commit the robbery and whether she had ever handled the murder weapon. She answered no to both questions. The test results for these two questions were inconclusive. These examinations, and their results, were not disclosed to the defendant before his trial. Ibid.
The defendant filed a petition for habeas corpus, asserting that the failure to disclose these polygraph examinations constituted a violation of the prosecution's obligations under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The District Court denied the petition, but the Court of Appeals for the Ninth Circuit reversed. According to the Court of Appeals, the information was "material" under Brady, even though it would have been inadmissible at the defendant's trial. The Supreme Court summarized the position of the Court of Appeals thusly:
The court reasoned that "[h]ad [respondent's] counsel known of the polygraph results, he would have had a stronger reason to pursue an investigation of Rodney's story"; that he "likely would have taken Rodney's deposition" and that in that deposition "might well have succeeded in obtaining an admission that he was lying about his participation in the crime" and "would likely have uncovered a variety of conflicting statements which could have been used quite effectively in cross-examination at trial."
[Wood, supra, 516 U.S. at 5, 116 S.Ct. at 9-10, 133 L.Ed.2d at 6.]
The Supreme Court described this reasoning as "a misapplication of our Brady jurisprudence...." Id. at 2, 116 S.Ct. at 8, 133 L.Ed.2d at 4. The Court reiterated that "evidence is `material' under Brady, only where there exists a `reasonable probability' that had the evidence been disclosed the result at trial would have been different." Id. at 5, 116 S.Ct. at 10, 133 L.Ed.2d at 6.
The information at issue here, thenthe results of a polygraph examination of one of the witnessesis not "evidence" at all. Disclosure of the polygraph results, then, could have had no direct effect on the outcome of trial, because respondent could have made no mention of them either during argument or while questioning witnesses. To get around this problem, the Ninth Circuit reasoned that the information, had it been disclosed to the defense, might have led respondent's counsel to conduct additional discovery that might have led to some additional evidence that could have been utilized. Other than expressing a belief that in a deposition Rodney might have confessed to his involvement in the initial stages of the crimea confession that itself would have been in no way inconsistent with respondent's guiltthe Court of Appeals did not specify what particular evidence it had in mind. Its judgment is based on mere speculation, in violation of the standards we have established.
[Id. at 6, 116 S.Ct. at 10, 133 L.Ed.2d at 7.]
In my judgment, defendant's request for discovery here is similarly based on no more than speculation and conjecture. Just as the results of the polygraph tests were not "evidence" in Bartholomew, that this officer made this statement is not "evidence" here. Granting defendant's request is to enter into the type of "fishing expeditions permitted in civil proceedings" but not in criminal proceedings. State v. Tull, 234 N.J.Super. 486, 498, 560 A.2d 1331 (Law Div. 1989).
*386 Speaking for our Supreme Court, Justice Handler wrote:
Our criminal justice system recognizes fully a defendant's right to prepare a defense and have complete discovery. However, allowing a defendant to forage for evidence without a reasonable basis is not an ingredient of either due process or fundamental fairness in the administration of the criminal laws.
[State v. R.W., 104 N.J. 14, 28, 514 A.2d 1287 (1986).]
I am unable to agree that defendant has established any reasonable basis that would warrant permitting him to set out on what constitutes nothing more than a foraging expedition.